---

## Case No. 4,463.

### The E. M. McCHESNEY.

[8 Ben. 150;[1] 49 How. Pr. 178; 21 Int. Rev. Rec. 221.]

District Court, S. D. New York. June, 1875.[2]

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 4,464.]

Goodrich & Wheeler, for libellants.
J. B. Elwood, for claimant.

BLATCHFORD, District Judge. The libel in this case alleges, that, in November, 1873, at the city of Buffalo, the libellants shipped on board of the canal boat E. M. McChesney, then lying in the Buffalo creek or river, a navigable stream emptying into Lake Erie, about 15,000 bushels of oats, to be transported on said boat from Buffalo to the city of New York, and there delivered to A. R. Gray & Co., the agents of the libellants, for a certain rate of freight, then agreed to be paid by the libellants; that the boat proceeded on said voyage with said oats, and, being detained by the ice in the canal, did not arrive at the city of New York till the month of May, 1874, and then failed to deliver 3,300 bushels of the oats; and that the master of the boat has concealed the oats and converted them to his own use. The libellants claim damages to the amount of $2,145.

The answer, which is put in by a mortgagee of the canal boat, as claimant, avers that this court has not jurisdiction of the subject matter of this suit, in that the boat was a canal boat, employed in transporting freight on the Erie canal, between Buffalo and Albany, in the state of New York, and was so engaged, and between those points, at the time and on the occasion of the alleged loss and conversion set forth in the libel; that the waters of said canal are not

within the ebb and flow of the tide, and are not navigable waters, within the legal acceptation and understanding of that term, and the said boat is not subject to the admiralty and maritime jurisdiction of this court; that, at the time the oats were shipped on the boat, and at the time the boat was libelled and seized, and prior thereto, the claimant had a lien on the boat, of which the libellants had notice, arising from and by virtue of a chattel mortgage executed thereon for the original purchase money thereof, on the 6th of May, 1873, for the sum of $2,467.50, by Samuel Beebe and Levi Beebe to one William Foster, of Cleveland, Oswego county, New York, and duly filed by him in the office of auditor of the canal department of the state of New York, on the 8th of May, 1873; that the said mortgage was, on the 19th of May, 1873, for a valuable consideration, sold and assigned to the claimant, who, in pursuance of the requirements of the statute of New York, refiled the same in said auditor's office, with a statement of the amount due him thereon, on the 23d of April, 1874; that the claimant, at the time the oats were shipped on the boat, and at the time the boat was libelled and seized, was the owner and holder of said mortgage, and the same was then in full force, and, by virtue thereof, the claimant then had a valid and existing lien on said boat, which he is still entitled to assert, to the amount of $2,093.22, with interest thereon from May 5th, 1874; that the claim and lien of the libellants, if any they have, is subordinate to that of the claimant; and that, if any part of the cargo was not delivered, the same was feloniously abstracted therefrom, with the knowledge of the master of the canal boat, and without the knowledge, privity or consent of the claimant, and the same was not within the scope of the said master's employment, and was done while the boat was not within the jurisdiction of this court.

The bill of lading under which the oats were shipped calls itself, on its face, a "bill of lading." It is signed by the master of the boat. It says: "Buffalo, Nov. 10, 1873. Shipped by Van Buren & Co., as agents and forwarders, in apparent good order, on board canal boat E. M. McChesney, of Rome, Captain John O'Grady, the following described property, to be transported to the place of destination, without unnecessary delay, and delivered to the consignees in like good order, as noted below. * * * All damage caused by the boat or carrier, or deficiency in the cargo from quantity as herein specified, to be paid for by the carrier and deducted from the freight, and any excess in the cargo to be paid for to the carrier by the consignee. * * * Received of Van Buren & Co., shippers, $753, to be used in the transportation of above cargo and in paying the expenses of running boat from Buffalo to New York, and for no other purpose whatsoever. * * *

Order Geo. Ellison, care O. E. Kent & Co., New York, 15,000 bush. No. 2, oats. * * * Fr't to New York, per bush., 7¼. $1087.50." There is no exception as to liability, in this bill of lading.

1. As to the jurisdiction of the court. It is set up in the answer, that the boat was a canal boat, employed in transporting freight on the Erie canal, between Buffalo and Albany, and was so engaged, and between those points, at the time of the loss and conversion of the oats; that the waters of said canal are not within the ebb and flow of the tide, and are not navigable waters, within the legal acceptation of that term; and that the boat is not subject to the admiralty and maritime jurisdiction of this court. The implication of the answer is, either that the boat was wholly employed in navigating the canal, and so was not subject to admiralty jurisdiction, or was, at the time of the loss and conversion of the oats, in the waters of the canal, and so was not subject to such jurisdiction. But the contract of affreightment made by the bill of lading was for the transportation of the oats from Buffalo to New York by this boat, and the bill of lading expressly says that this boat is to run from Buffalo to New York. Of course, she herself was to transport the oats in herself from Buffalo to New York all the way, and by water. She could not do so without going down the Hudson river from Albany to New York, although she was to go upon the waters of the canal from Buffalo to Albany. Moreover, the evidence shows, that the oats were laden upon the boat in the Buffalo river, a navigable stream connecting with Lake Erie, and at some distance from the entrance of the mouth of the Erie canal into such river.

In the case of The Ann Arbor [Case No. 408], in this court, before Judge Ingersoll, in December, 1854, a libel was filed against a canal boat, to recover the value of some butter alleged to have been shipped on board of her at Rome, New York, on the Erie canal, for transportation by her, by way of said canal and the Hudson river, to the city of New York. The court held that it was shown that all the butter which was shipped was delivered at New York, but went on to say: "It is, therefore, not necessary to decide the question of jurisdiction; but, without having sufficiently considered that question, the impressions of the court are against the right of the libellants to proceed against the boat. The canal boat was not built to navigate tide waters, but the Erie canal, and is not a ship, within the definition in Ben. Adm. § 215, not being a 'locomotive machine.' When a ship is libelled in an admiralty court, for a breach of a maritime contract, it is upon the ground that the ship itself contracts; and, if such a boat as this, while on the Erie canal, in Oneida county, can enter into and bind itself by a contract, so as to come within the control of a court of ad-

miralty, I do not see but that any vessel or thing capable of containing freight, built and designed to make headway on the New York Central Railroad, by means of the wheels of the railroad cars, can, in the same county, enter into and bind itself by a maritime contract, and come under the control of a court of admiralty, provided it is so constructed, that, when it arrives at Albany, it can be launched from the wheels of the railroad carriage into tide water, and be towed by a steamboat to New York." That case came before Mr. Justice Nelson, in the circuit court for this district, by appeal, in 1858 (The Ann Arbor [supra]), and, while holding that the proof as to the shipment on the boat of the merchandise alleged not to have been delivered by her was too doubtful to found a decree upon it for the libellants, he said: "I am, also, inclined to think that the canal boat is not a ship or vessel, upon the North river, or other navigable waters within the admiralty jurisdiction, subject to maritime liens in the admiralty, for breaches of contracts of affreightment. Those boats are exclusively adapted to canal navigation. Of themselves, they have no power as respects navigation upon public waters, any more than a raft, an ark, or a mud scow."

By virtue of section 563 of the Revised Statutes of the United States, this court has exclusive jurisdiction of all civil causes of admiralty and maritime jurisdiction, this provision being a re-enactment of section 9 of the act of September 24, 1789 (1 Stat. 76, 77), which gave to the district courts of the United States exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction. Passing over earlier decisions, it was held by the supreme court, in The Belfast, in 1868, 7 Wall. [74 U. S.] 624, that a proceeding in rem to enforce a contract of affreightment is within the exclusive original cognizance of the district courts of the United States, although the contract be one of transportation between ports and places in the same state, and all the parties are citizens of the same state, provided such contract be one for transportation on navigable waters to which the general jurisdiction of the admiralty extends.

In the case of The Eagle, in 1868, 8 Wall. [75 U. S.] 15, it was held, that the district courts have cognizance of all civil causes of admiralty jurisdiction upon the lakes and waters connecting them, the same as upon the high seas, bays and waters navigable from the sea. The effect of this decision was to hold that the admiralty jurisdiction created by the constitution and conferred by statute on the district courts is the same everywhere within the United States, and that no distinction between tide waters and other navigable waters exists in that regard.

In the case of The Belfast [supra], the contract of affreightment was for transportation between two places in the same state, and on a river which was navigable water of the United States. In the present case, the contract was for transportation a short distance on a navigable river emptying into Lake Erie, and then on an artificial canal to Albany, and then down a navigable river, 150 miles, to the city of New York. It is a well known fact that a large commerce is carried on between Buffalo and New York, by boats such as the one involved in the present case, which, to avoid transshipment of cargo at Albany, are towed from Albany to New York, on the Hudson river, by steamtugs, they having been towed from Buffalo to Albany on the canal by horses. It is also known, that, within a very recent period, skill and science have succeeded in so constructing and arranging canal boats propelled by steam that they are practically successful in carrying cargoes, both ways, between Buffalo and New York, through locomotion produced by their own steam motive power, and without the aid of external means of propulsion, their voyages being continuous through the canal and the Hudson river, and vice versa. So far as waters are concerned, there is no good reason for saying, that, if the contract of such a vessel for the transportation of cargo covers only the passage between New York and Albany on the Hudson river, the vessel shall, in respect of such contract, be subject to admiralty jurisdiction, while the fact that such contract covers, in addition to the river transit, a transit on the canal, the two transits making up one continuous voyage by one and the same vessel, with one and the same cargo, shall destroy such jurisdiction, on the idea that the canal is not a navigable water of the United States. If the instrument of transit be a vessel, its navigation of the Hudson river is a navigation on a navigable water of the United States. Because, after leaving the river, it pushes its way, by such means of propulsion as are afforded to it, through an artificial navigable canal, to points where a large commerce may be opened, and one with other states, is not a circumstance which, at the present day, and in view of the recent course of decisions by the supreme court, as to the extent of the admiralty jurisdiction, should be allowed to have the effect to destroy such jurisdiction.

In the case of The Montello, 11 Wall. [78 U. S.] 411, the question arose as to what was a navigable water of the United States, within the meaning of a statute requiring a steam vessel to be licensed in order to transport merchandise or passengers on navigable waters of the United States. The water in question was the Fox river, in the state of Wisconsin. The court said that the point to be determined was, whether the Fox river had such a connection with other waters as to form, with them, a continuous highway, over which commerce was or might be carried on with other states or foreign countries, in the customary modes in which such commerce was conducted by water; that it

was a navigable water of the United States, if it formed, by itself or by its connection with other waters. such a highway; and that, if it was not of itself a highway for commerce with other states or foreign countries, or did not form such highway by its connection with other waters, and was only navigable between different places within the state, then it was not a navigable water of the United States, but was only a navigable water of the state. These views are confirmed by the opinion of the same court. when the same case came before it again. The Montello, 20 Wall. [87 U. S.] 430. The Fox river is a river wholly within the state of Wisconsin. It connects with Lake Michigan. It formed, at an early day, in connection with the Wisconsin river, a channel for trade between the lakes and the Mississippi river, into which latter river the Wisconsin river runs. Between the Fox river and the Wisconsin river there was, for a long time, a land portage for some two miles, with no water communication across such interval. The Fox river itself, in its natural state, had, in parts of it, rapids and falls, and there were portages around these obstructions; but it was navigated in parts by loaded boats pushed with poles, propelled by oars, and dragged by animal power. In course of time, a private corporation improved the navigation of the Fox river, and constructed canals around the obstructions in it, and a canal across the land portage between it and the Wisconsin river, so that there had come to be uninterrupted water communication for steam vessels of considerable capacity, between Lake Michigan and the Mississippi river. On these facts, the supreme court held, that, although the Fox river, in its natural state, could not be navigated throughout its entire length by steamboats or sail vessels, yet, as it could be navigated through its length, by the aid of a few portages, by boats propelled by animal power, and carrying a considerable tonnage, it was navigable in fact, and was navigable water of the United States, used as a highway for useful commerce with other states. The Fox river being thus a navigable water of the United States, and, therefore, under the general jurisdiction of the admiralty, it could never be held that a contract of affreightment for the transportation of merchandise down the Fox river, from the place where the canal from the Wisconsin river enters into the Fox river to the mouth of the Fox river, would, on the authority of the Belfast, be a subject of admiralty cognizance, to be enforced by a proceeding in rem, in admiralty, against the contracting vessel, while a contract of affreightment for the transportation of merchandise by the same vessel from Portage City, on the Wisconsin river, through the short canal of two miles' length, to the Fox river, and then down the Fox river to the mouth of the Fox river, would not be a subject of admiralty cognizance. Yet, the latter contract is the contract in the present case. The fact that the canal in the one case is 350 miles long, and in the other case is two miles long, can make no difference in principle. In both cases the canal is a wholly artificial channel, and not an improvement of a natural channel.

In the case of The Avon [Case No. 680], the jurisdiction of the admiralty over a collision in an artificial canal was upheld. The case was one where a Canadian vessel, on her way from a Canadian port on Lake Ontario to a Canadian port on Lake Erie, collided in the Welland canal, a wholly artificial canal, wholly in Canadian territory, and extending from Lake Ontario to Lake Erie, with an American vessel, on her way from one American port to another American port. It is not necessary, in the present case, to inquire whether the admiralty has jurisdiction of a collision in the Erie canal, or whether it has jurisdiction of a contract of affreightment for the transportation between two points on the Erie canal, of merchandise which is not, by the same contract, agreed to be transported by water to a point beyond the terminus of such canal. But the decision is, that the admiralty has jurisdiction of the contract in the present case.

In so far as jurisdiction is questioned because the boat is a boat built to navigate the canal, and has no means of locomotion in herself, the objection cannot prevail. A large portion of the commerce of the Hudson river is carried on by vessels which are towed by steam vessels between different places on that river. Whatever narrow views may at one time have prevailed, the case of The Montello, last cited, is authority for holding that a vessel moved otherwise than by the power of the wind, or by steam power within herself, and thus carrying on commerce. is a subject of admiralty cognizance.

As to any lien possessed by the claimant by virtue of the mortgage, it is subordinate to the claim of the libellants. The respondent, with full notice, allowed the boat to be used as a general freighting boat. She was so used with his consent. If he had been the absolute owner of the boat, she would have been responsible for contracts of affreightment made by her duly appointed master. The mortgagee who allows the owner to run and use the boat as a general freighting boat, to earn compensation for the benefit of such owner, subjects her to the ordinary obligations which such boats incur through the contracts of the master. The master was pro hac vice the agent of the mortgagee. The mortgagee can have no exemptions which the owner would not have.

As to the defence that the oats not delivered were feloniously abstracted from the boat with the knowledge of her master, and without the knowledge, privity or consent of the claimant, it is sufficient to say, that the terms of the bill of lading are absolute,

that all damage caused by the boat or carrier, or deficiency in the cargo from quantity as specified in the bill of lading, is to be paid for by the carrier. It was open to the carrier to restrict his liability, but he made an absolute engagement to respond, with the boat, for any loss of cargo.

But, it is suggested that the loss was not caused by the boat or the carrier, because it was not within the scope of the master's employment to steal, or be privy to the stealing of, the oats. A master is civilly liable for the lawless act of his servant, whether the act be one of omission or commission, and whether negligent, fraudulent or deceitful, if the act be done in the course of the servant's employment; and it makes no difference that the master did not authorize, or even know of, the act or neglect of the servant, or even that he disapproved or forbade it. The test is as to whether, at the time, the alleged servant did or did not sustain the relation of servant to the master. A servant, trusted with the control and care of his master's carriage and horses, and directed by the master to drive to a certain place, disregarded the order, and drove elsewhere, and, while returning, drove against a woman and injured her. The master was held liable for the act of the servant, although, at the time, the servant was acting in disregard of the master's orders. As the master had entrusted the servant with the control of the carriage, it was held to be no answer that the servant acted improperly in managing it; and the master was held liable, on the ground that he had put it in the servant's power to mismanage the carriage, by entrusting him with it. Sleath v. Wilson, 9 Carr. & P. 607. These views are approved by the supreme court, in Philadelphia & R. R. Co. v. Derby, 14 How. [55 U. S.] 486, 487, and it is there said, that no case can be found which asserts the doctrine that a master is not liable for the acts of a servant in his employment, when the particular act causing the injury was done in disregard of the general orders or special command of the master. In the present case, the care of the oats on the boat was confided to the captain of the boat. The owner of the boat and her mortgagee directed the captain to deliver the oats at New York to the address given in the bill of lading, and directed him not to steal them on the way. He did steal them on the way. But they were entrusted to his control, and the owner and the mortgagee of the boat put it in the power of the captain to steal them on the way, and did it in the face of the absolute obligation in the bill of lading that the oats should all of them be delivered at New York, or the vessel should respond for the deficiency.

It can make no difference as to the jurisdiction of this court, that the oats abstracted were taken at a place not within the jurisdiction of this court. The jurisdiction depends wholly on the arrest of the vessel within the jurisdiction of this court. There must be a decree for the libellants, for the value of the oats named in the bill of lading which were not delivered, with costs, with a reference to a commissioner to ascertain such value.