MALONY *v.* CITY OF MILWAUKEE, etc.

*(District Court, S. D. New York.    April 3, 1880.)*

ADMIRALTY JURISDICTION — MARITIME TORT ON CANAL — "NAVIGABLE WATER OF THE UNITED STATES."—An alleged maritime tort, committed upon an artificial water-way or canal opened by a state for the purposes of commerce, is within the admiralty jurisdiction of the United States courts, where such water-way is in fact used as a highway of commerce between the states of the Union and between foreign countries.

Libel to recover damages caused by a collision.

*E. D. McCarthy,* for libellant.

*F. A. Wilcox,* for claimants.

CHOATE, J.    This is a libel to recover damages caused by a collision between the libellant's canal boat Oliver C. Gibson and the steam canal boat City of Syracuse, while the latter was in tow of the steam canal boat City of Milwaukee, which was proceeding under steam and towing the City of Syracuse on a hawser of about 100 feet in length. The collision happened on the evening of November 2, 1877. The place of the collision was in the Erie canal, about 100 miles east of Buffalo, in the county of Munroe, and state of New York. The canal boats City of Milwaukee and City of Syracuse were attached by the marshal of this district, on the process issued in this case, in a place called the New Jersey central basin, within the limits of Jersey City. This basin communicates with the bay of New York through the Morris canal basin, and the place of seizure was about half a mile from what is now the open bay, and at a point about 500 feet southerly of the original shore line at high-water mark, and about 150 feet westerly from the westerly side of Henderson street, which is at that place an artificial structure built out into the bay upon the flats. Thirty years ago this basin in which the boats were seized was part of the bay of New York, and admitted to be below the ordinary high-water line on the Jersey shore.

Two defences are made by way of exception, as well as by answer, which it is necessary to dispose of before considering the merits of the case: (1) that the subject-matter of the suit

is not within the admiralty jurisdiction of the United States, the place of collision being upon a canal or artificial water-way over which that jurisdiction does not extend; and (2) that the place where the canal boats were seized by the marshal is without the limits of the southern district of New York.

1. The first question is one of very great importance to the commercial interest of the country. It has never been expressly decided by the supreme court of the United States, but the weight of authority is in favor of the jurisdiction. In the case of the *The Monitor* the district court for the eastern district of New York entertained jurisdiction of a case of collision upon the Delaware & Raritan canal, which, like the Erie canal, is an artificial water-way over the land, but communicating between what are admitted to be navigable waters of the United States.

Upon an application to the supreme court for a writ of prohibition that court refused the writ. It is understood, however, that the eight justices who heard the case were equally divided in opinion, and no written opinions were delivered. The point arose, and was expressly ruled in favor of the jurisdiction by Judge Emmons, in the case of *The Avon*, 1 Brown's Adm. Rep. 170. It is also understood that the jurisdiction is entertained by several of the district courts. The point is somewhat discussed in the case of *The E. D. McChesney*, 8 Ben. 150, by Judge Blatchford, but the case before him did not call for a determination of the question. Without going at large into a discussion of the reasons for and against the jurisdiction, it is enough for the disposition of the point in this case to say that, upon a careful perusal of the opinions delivered by the supreme court which touch upon the question, it seems to me that the test established for determining the jurisdiction in admiralty, in a case of alleged maritime tort not on tide-water, is whether the place in which it was committed is upon the "navigable waters of the United States," and that an artificial water-way or canal opened by a state to public use, for purposes of commerce, and while in fact used as a highway of commerce between

the states of the Union, and between foreign countries and the United States, is "navigable water of the United States" within the meaning of that term as used to define and limit the jurisdiction of the admiralty courts. Nor, as it seems to me, is there any force in the suggestion that this proposition trenches upon the rightful power and jurisdiction of the state through whose territory and by whose law, in force for the time being, the canal is so opened and used, because the exercise of this jurisdiction does not in any way in itself impair or affect the right of the state (whatever that right may be) to withdraw or terminate that dedication of its property to the public uses of commerce.

At any rate, considering the present state of authority and practice in the courts inferior to the supreme court, I do not feel at liberty to decline the jurisdiction. The question is one of national importance, and must, doubtless, soon receive full consideration and a final determination in the supreme court. *The Genessee Chief*, 12 How. 443; *The Hine*, 4 Wall. 555; *The Eagle*, 8 Wall. 15; *The Daniel Ball*, 10 Was. 557; *Ins. Co.* v. *Dunham*, 11 Wall. 1; *The Montello*, 11 Wall. 411; *The Lottawanna*, 21 Wall. 558.

2. In respect to the second objection it is claimed, on the part of the libellant, that the convention between the states of New York and New Jersey, in the year 1833, which was consented to by the United States, with some qualifications, (Revised Statutes, § 541,) has enlarged the limits of this district, so that it now extends to high water mark on the New Jersey shore, instead of being limited to the low water mark, as it is admitted to have been prior to 1833.

This claim, however, was very fully considered and determined in the negative by Judge Blatchford, in the case of *The L. W. Eaton*, in this court, (decision January 26, 1878, unreported.)

The only question, therefore, is whether, at the time of their seizure by the marshal, these canal boats were above or below low water mark. The evidence on that point is somewhat conflicting, and there is no doubt that in exceptionally low tides, and particularly when a strong north-west wind has

kept the tides down, the water all runs out of this basin and leaves the flats bare where these boats lay; but the preponderance of the proof is that ordinary low water mark is within less than 150 feet from the westerly side of Henderson street, at the part of the basin where the boats lay, and that they were below low water mark at the time they were seized. This exception must therefore be overruled.

3. The merits are clearly with the libellant. The libellant's boat was coming east; the two steam canal boats were going west. The night was dark and rainy. The wind was blowing a violent gale; so violent that shortly before this collision the two steam canal boats were windbound on the berme bank of the canal, towards which side the wind blew. Before that they had been proceeding with the City of Syracuse ahead, pushed by the City of Milwaukee. The wind was so strong that this method of proceeding was abandoned as impracticable, and the City of Milwaukee took the City of Syracuse on a hawser of about 100 feet in length, and towed her in that way till the collision. The collision happened about 200 to 300 feet west of the "wide water" or "ox-bow," near Freeport. Before the two steam canal boats got out of the "wide water" they saw the light of the Gibson ahead, in the canal. Her light indicated that she was a horse-boat and the lights of the other boats indicated that they were steamboats. The rules, as understood by both parties, required the steamboats to take the berme bank side, and the horse-boat the tow-path side of the canal. The distance at which the Gibson's light was made appears, by the evidence of the master and wheelsman of the City of Milwaukee, to have been from 300 to 500 feet.

The allegation of the answer is that when the light was made the two steamboats were proceeding in the middle of the canal. The proofs show that they were not, properly speaking, in the canal, but still in the wide water, approaching and very near to the canal. But the proofs and the answer both show that, in order to get into their proper place in the canal for passing the Gibson safely, it was necessary for the steamboats to haul further towards the berme bank, which,

as they were going, was to port or the left hand; and it is clear that the City of Milwaukee starboarded in order to get into that situation. They all kept on without slackening speed. Meanwhile the Gibson, if before she had been in the middle of the canal, had hauled over to the tow-path side. The Gibson and the City of Milwaukee passed each other safely, but very close, the evidence being that they rubbed together, at one point at least. The allegation of the libel is that the two steamboats did not keep their own side, but crowded the Gibson against the tow-path side, and, after the City of Milwaukee passed, the City of Syracuse, being still on the tow-path side and badly steered, ran against the bow of the Gibson on the starboard side, breaking her in so that she immediately sunk.

The allegation of the answer is that as the Gibson passed by the stern of the City of Milwaukee she took a sudden sheer from the tow-path side towards the berme bank side, and thus threw herself in the way of the City of Syracuse, which was properly proceeding well over on the berme bank side.

The testimony is that the steersman of the Gibson was alarmed before the bow of the City of Milwaukee came up to his bow, by the way she was coming, threatening to run into him. His alarm was so great at the situation that he shouted out to the people on the boat, who were below at supper, that a boat was running into them and they would be sunk. That the City of Milwaukee was in his way and had not yet hauled safely over to her own side of the canal, appears also clearly from the testimony of her master and wheelsman that, from the time they saw the light, they kept a starboard wheel till her bow lapped the Gibson 40 feet, when it became necessary to throw her wheel the other way in order that her stern might clear the stern of the Gibson.

It is clear from this that the City of Milwaukee, towing the City of Syracuse after her on a hawser, was crossing from the middle of the canal, or from further towards the tow-path side, over towards the berme bank, on an angle. If, as is clear, while in this position, the City of Milwaukee was obliged

to throw her stern towards the berme bank to clear the Gibson, then the City of Syracuse, if she was stretched out straight behind the City of Milwaukee, as the master and wheelsman of the City of Milwaukee say she was, was further out than the stern of the City of Milwaukee towards the tow-path side, and in very great danger of coming in collision with her, since at that time those two boats were only 100 feet apart, and approaching at a combined rate of three and a half miles an hour. These facts show conclusively that the City of Milwaukee did not turn out soon enough to enable the City of Syracuse to clear the Gibson and fix the liability for the collision on the two steamboats, which were under one command, unless the Gibson is shown to have contributed to the disaster by encroaching on the other boats, or by sheering out after passing the City of Milwaukee, as alleged in the answer. But the evidence is, I think, very satisfactory that the Gibson was on the tow-path side when she was struck.

The City of Syracuse is a very sharp boat, and her stern struck and broke into the bow of the Gibson about two feet from her stern, on the starboard side, breaking two of the heavy iron wales, and her planking and timbers, causing her to sink within a very short time. The blow was nearly head on, and I see no force in the argument, upon the proofs in the case, that the blow pushed the bow of the Gibson in any closer than she was before to the tow-path. It is clear that if the City of Syracuse had been going straight along on the berme bank side, as is claimed for her, and the Gibson quartering towards that side as is also claimed, and so far over as to be struck where she was, her bow would not be thrown by the blow towards the tow-path, nor would she have sunk, as the proof is that she did sink, with her bow aground, close by that side. To those on the two steamboats proceeding at an angle towards the berme bank, as is above shown, the Gibson may have seemed to be sheering out upon their course, although in fact she was going straight, and this explains the contradiction in the testimony on that point.

Great stress has been laid by the claimants upon the fact testified to by some of their witnesses that in pulling out the

bridge from the Gibson, to save the horses which were on board, the shore end of the bridge rested in the water on the sloping wall below the tow-path.   This, it is claimed, shows that the Gibson was too far out into the canal.   The argument has little force, for want of certainty in the elements of the calculation.   The length of the bridge, and the distance from the wall to water deep enough to float the Gibson, are only given according to the estimates of witnesses, and not from actual measurements.   The possible variation or error in these elements leaves the place still undetermined, and to be fixed by other proof.   The libellant's witnesses deny the fact that the bridge rested in the water, but quite likely they have forgotten the circumstance; and it is probable that some of the claimants' witnesses have exaggerated it when they place the end of the bridge two feet under water, and make the horses climb or jump a steep wall of stone some six feet above the bridge.   But, however this may be, the evidence is wholly indecisive as proof of the Gibson having sheered out. Such a sheer, under the circumstances, would be in the highest degree improbable and fool-hardy—a running into danger with one's eyes open.   Upon the whole evidence it is clear that this allegation of a sheer on her part must be held not proved.

In reaching this conclusion I have given very little weight to the testimony of the steersman of the City of Syracuse, who was a witness for the libellant, and who testifies that it was impossible, on account of the wind and defects in the rudder of that boat, to keep her headed towards the berme bank at all as she approached the Gibson.   This witness is shown to have made contradictory statements on that point out of court, and on several other points he is so seriously contradicted that I should be unwilling to find any fact on his unsupported testimony.

On the question how the City of Syracuse headed with reference to the course of the City of Milwaukee, the master and steersman of the latter boat, as above stated, thought she followed nearly straight.   The libellant's witnesses testify that she did not follow straight, but headed more towards the

tow-path side. They corroborate the wheelsman of the City of Syracuse on this point, describing her as steering wildly, heading towards the tow-path.

It is not at all improbable that, with such a violent wind and the boat only half loaded, as she was, and having a very sharp bow, she should yaw and dive somewhat, even if the witnesses from the City of Milwaukee are right that in the main she followed well.

The position and nature of the blow tend strongly to indicate that at the moment of the collision she was headed more towards the tow-path side, or, at any rate, less towards the other side than the City of Milwaukee—in fact, on a dive, as the witnesses call it, in the direction of the Gibson; and there is nothing in the case to make this so improbable as to warrant the inference that, from the position of the blow, and the relative positions of the two steamboats, the Gibson was then out of her proper place.

I have given little importance to alleged admissions on either side after the accident. There is evidence that the libellant, in conversation, said the other boats were not to blame, and that the master of the City of Milwaukee said it was unavoidable; but, besides this evidence being contradicted, such circumstances are of no importance where the facts are so plainly proved as in this case.

The libellant was insured, and has apparently no interest in the suit. Being insured he was less likely to complain of the other party, and in talking of the character of the weather and the furious wind he may well have said something that the witnesses understood to mean that he did not blame the other boats. Such evidence is generally worthless, and of no weight, considering the great uncertainty and inexactness in the report of conversations years after they take place.

The cause of the collision was the carelessness of those in charge of the claimants' boats in not sheering out in time. and keeping out of the way of the Gibson; in not proceeding so slowly and carefully that they could do so after coming in sight of her.

The furious wind made the navigation particularly dangerous, especially with the City of Syracuse on a hawser.

Decree for libellant, with costs, and reference to compute damages.