THE CITY OF RICHMOND.[1]

WESTERN UNION TEL. CO. *v.* INMAN & I. S. S. CO., Limited.

INMAN & I. S. S. CO., Limited, *v.* WESTERN UNION TEL. CO.

(*District Court, S. D. New York.* June 24, 1890.)

OBSTRUCTION TO NAVIGATION—TELEGRAPH COMPANY—SUBMARINE CABLES—NAVIGABLE MUD.

A telegraph company, whose submarine cables are laid in the soft mud or silt at the bottom of a navigable river, in such a manner as to interfere with vessels, which are accustomed to plow through the mud in their movements about the docks, thereby obstructs navigation, contrary to the provisions of Rev. St. U. S. § 5263, which authorizes any telegraph company to lay telegraph lines "over, under, or across the navigable streams and waters of the United States," provided they are "so constructed and maintained as not to obstruct the navigation of such streams or waters," and is answerable for damages thereby caused to vessels.

In Admiralty.

Action by the Western Union Telegraph Company to recover for damages to its submarine cables. Cross-action by the owner of the City of Richmond to recover for injury to the propeller of that steam-ship, damaged by contact with the submarine cables of the telegraph company.

*Dillon & Swayne,* for respondents.

*Biddle & Ward,* for libelants.

BROWN, J. The above cross-libels were filed to recover the damages sustained by the respective parties through the fouling of the propeller blades of the steamer City of Richmond with the submerged telegraph cables of the Western Union Telegraph Company a little outside of the end of the pier of the Dutch Steam-Ship Company at Jersey City, in the North river, on the 19th of August, 1887. The telegraph company had 21 cables running under the North river at Cortlandt street, New York, connecting with the wires at Jersey City. The cables were run under the stringers of the pier, and made fast to several spiles under the pier at about low-

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

water mark, mostly about 50 feet inside of the exterior end of the pier. They were laid from the New York end, being reeled off from a drum carried by a boat crossing towards the Jersey side. When brought to the spiles under the pier, they were pulled in as tightly as five or six men could pull them, and then made fast.

The waters of the North river are constantly depositing more or less of a fine sediment. The deposits are most copious on the Jersey side, where a slight bank of mud is thereby formed in front of the piers in question, and at a little distance from them. The deposits are of every degree of consistency, from muddy water down to the solid bed of the river. It is the ordinary practice for vessels of deep draught, in going in and out of the slips in that vicinity, to plow more or less through this navigable mud. On the 19th of August, 1887, the City of Richmond, having just arrived from Liverpool, finding that her slip, which was immediately below the Dutch pier above referred to, was full, so that she could not then get a berth, rounded to in the flood-tide, and landed her cabin passengers at the end of the pier below, and then proceeded to back away from the end of the pier, in order to come to an anchorage for the purpose of transferring her steerage passengers bound for Castle Garden. While backing through this mud, her keel and propeller blades caught the cables running through the mud, and became badly entangled in them. Twelve of the twenty-one cables were broken. Some became so firmly wound around the propeller and shaft that it was necessary to dock the steamer in order to clear them, to her damage, as alleged, of $2,000. The cost of repairing the cables is alleged to be $10,789; and the telegraph company claims $50,000 in addition for the loss of the use of the same during 16 days.

The act of congress passed July 24, 1866, (Rev. St. U. S. § 5263,) authorizes any telegraph company to "construct, maintain, and operate lines of telegraph over, under, or across the navigable streams or waters of the United States," provided they are "so constructed and maintained as not to obstruct the navigation of such streams or waters." The libel of the telegraph company alleges that the cables were "laid and maintained upon the bed of said stream so as not to interfere with the navigation of said stream;" that the location and use of the cables thus laid were well known to the owners of the steamer, their agents and servants; and that their loss and damage were caused by the steamer's wrongful and negligent attempt to navigate in the vicinity of said cables when the tide was low, and when there was not water of sufficient depth to float her without coming in contact with the bed of the stream. The libel and answer of the steam-ship company allege that the place where the cables were laid is constantly used by steam-ships and other vessels engaged in carrying on commerce and navigation on the Hudson river; and that, although there is not much water there for vessels of large size and deep draught, the said cables were laid without any protection whatever, and with nothing to indicate the place where they lay; that the steamer was managed with all proper care, and that the loss was caused by the wrongful obstruction of navigation by said cables, and by the careless and im-

proper manner in which the cables were laid, rendering navigation dangerous and unsafe. The evidence shows that each cable was about 1½ inches in diameter, and, running a mile in length from pier to pier, weighed about 8 tons; that at the exterior end of the Dutch pier the cables were raised several feet above the muddy bottom, but struck the mud about 20 feet outside of the pier, and thence sank deeper in the mud as they extended outward in the stream, going, so far as the evidence shows, about a foot and a half deep. The master and the pilot in charge of the City of Richmond testify that they had no notice of the cables, or of their position, and that there was no sign at the pier indicating their presence. More or less of such cables had run to this pier since 1867. Trouble from anchors fouling was not uncommon, but there were few instances of difficulty from vessels.

The steamer at this time drew 24 feet of water. The tide was ebb, about half out. The steamer, after discharging her passengers, could not remain at the end of the dock, because she would have been strained by taking the uneven ground at low water. She could not move ahead, and was therefore obliged to back. For that purpose her stern was swung out into the river by two powerful tugs, until she made an angle of about five points with the line of the shore. In doing this her stern was brought into the mud of the bank outside, above referred to, and two hawsers were parted in bringing her stern round to that angle. This angle was thought sufficient by the pilot, and was probably as much as her stern could be swung to port. She was then backed, as above stated, reaching the middle of the river without her officers at the time knowing that the fouling had occurred. Large steamers had long been accustomed to come to the docks in that vicinity. To run through more or less of such mud in doing so was and is an ordinary occurrence.

The telegraph company contend that they had a right to the use of the bottom of the river as a bed for their cables; that when laid on the bottom, under the act of congress, the cables were lawfully there; that, if they are maintained there, the company discharges its full duty, and that other parties interfering with them do so at their own peril; that the bottom of the stream is, in all cases, the limit of the rights of navigation; that cables laid upon the bottom are no obstruction to navigation; and that the prohibition of any "obstruction" in the act of congress does not embrace mere inconveniences to which vessels may be subjected by the cables, but refers only to those permanent conditions which prevent navigation, and not merely incommode it. An elaborate brief has been filed, and numerous cases cited in support of these contentions. Most of the cases cited refer to highways and bridges, or other authorized structures, in which the acts authorizing such structures have been held not to regard the occasional or minor inconvenience that may incidentally arise. Only two cases have been referred to that deal with the fouling of cables by vessels, viz., that of *Stephens & C. Transp. Co.* v. *Western U. Tel. Co.*, 8 Ben. 502, and *Blanchard* v. *Telegraph Co.*, 60 N. Y. 510, in both of which the cables were found to be an obstruction to navigation, the evidence in both showing that they ran above the bed of the stream.

As applied to navigation, I cannot sustain the distinction contended for between an obstruction and an interference. The cables, whatever their exact position was, were in a permanent position. If they interfered at all with the rightful or necessary use of steamers in that locality, the interference was also permanent. And a permanent interference, which prevents a vessel from going where she ordinarily has a right to go, and where in her maneuvers she may find it necessary to go, whether that necessity be constant or frequent, or only occasional, as emergencies may compel her, seems to me to constitute an "obstruction." The libel alleges that the cables as laid did not "interfere" with navigation. ALLEN, J., in the *Case of Blanchard, supra,* citing *People* v. *Vanderbilt,* 26 N. Y. 287, says:

"The Hudson river, at the point of injury, is a public navigable stream, and those navigating it for commercial purposes, and using it as a highway for vessels, have the primary and paramount right to it, and every interference with or obstruction of the navigation, or hindrance to the free passage of vessels upon it, is *prima facie* a nuisance, and unlawful."

Continuing, he observes that, while minor obstructions and temporary inconveniences are made lawful and tolerated, the necessary obstruction should "in every case be reduced to its minimum," and that, "if there is an unnecessary interference with navigation, the act becomes unlawful by reason of the excess of the limits within which obstructions are allowed, in the interests of the public. * * * From the evidence in this case," he continues, "it is quite evident that the wires and cables, in making continuous telegraph lines, can be so placed in the bed of the stream * * * as not in the least, or under any circumstances, to interfere with the unobstructed use of such streams for the purposes of navigation. * * * It can only be when improperly laid, or they have become displaced, that vessels adapted to the navigation can come in contact with, and either cause injury to, or receive injury from, them. * * * Telegraph cables so laid * * * as to * * * come in contact with vessels navigating the stream with such draught as the depth of water will permit, and which, but for such cables, would pass without difficulty or interruption, are improperly placed, and do injuriously interrupt navigation."

These principles seem applicable to this case, and to be sufficient for its determination. The soft, yielding, navigable mud, in which these cables were more or less immersed, is not to be confounded with the solid bed of the stream referred to in the above cases. Such mud constitutes no sharply-defined bottom. It changes from time to time, and is dredged out as occasion requires. It admits of navigation by steamers through it, and forms a part of the available draught of water, and as such it is counted on and constantly used. The line of division between such navigable mud and the true bottom is distinguishable by no other test than the practical one of the ability of the ship to plow through it. So far as affects the rights of navigation, whatever depth of mud of this variable consistency steamers are accustomed to plow through, and do and must plow through, in the course of their maneuvers in and

about the docks, is to be treated as a part of the stream, and not as a part of the solid bottom.

No doubt complaint cannot be lawfully made of inconveniences that arise *necessarily* from the laying of cables pursuant to the act of congress; but there is no evidence, nor can it be inferred, that this obstruction or interference with the backing of steamers through the soft mud was necessary. Not only were no pains taken to sink the cables below the depth of silt that vessels might use, but the cables were not allowed to sink the distance that their whole weight would carry them, since at the end of the wharf they were raised up so as to be several feet above the mud.

The telegraph company's contention amounts to this: that it has a right to the exclusive use of the silt or mud for its cables, without interference from vessels. Such, however, is not the language of the act of congress. That act permits the cables to go "under water," but "not so as to obstruct navigation." Nothing in the act gives any absolute right to lay cables in all cases on the very top of even a solid bottom. A cable so laid would not perfectly meet even the language of the statute, for it would still be in the water, and not, as the statute says, "under the waters." Circumstances might exist where, if it were reasonably practicable, the cables would be required to be laid below the surface of even a solid bottom; or, as ALLEN, J., says, "in the bed of the stream," and not merely on the surface of the bed. The language of the act should, however, be construed in reference to the practical objects in view, viz., to facilitate communication by cable on the one hand, while not permitting the obstruction of navigation on the other. When cables can reasonably be laid so as not to interfere with navigation, plainly they must be so laid. In mud of such varying consistency as lines the shores of the North river, there can be no practical difficulty in sinking cables so deeply as not possibly to interfere with the movements of vessels in any and all emergencies of navigation. The use by steamers in this harbor of the undefined margin of silt between the solid ground and clear water is necessary. Every inch that can be utilized is needed, and should be scrupulously preserved for the uses of navigation, as against all unnecessary interference. Any unnecessary interference with the free movements of vessels is, in my judgment, an "obstruction to navigation," within the meaning and intent of the act of congress.

I must find that there was no necessity for these cables being where they were, and that the telegraph company, under the act of congress, was bound to lay them deep enough, as they easily could have done, not to interfere with steamers, to whatever depth of navigable mud and water they might plow through. On this ground, without considering the question of notice, or lack of notice, of the existence of the obstruction, by a proper sign upon the adjacent dock, the libel of the telegraph company is dismissed, and that of the steam-ship company sustained, with costs.