# WEST INDIA & PANAMA TELEGRAPH COMPANY, LTD., Libellant,

## v.

# STEAMSHIP LEGAZPI, HER ENGINES, TACKLE, APPAREL AND FURNITURE, Respondent.

# COMPAÑIA TRANSATLANTICA ESPAÑOLA, Claimant.

---

San Juan, Admiralty, No. 1054.

INJURY BY SHIP TO SUBMARINE CABLE.

Admiralty—Jurisdiction.

    1. Admiralty has jurisdiction of a cause of action for damages which resulted from an accident which happened within the harbor of San Juan between the ocean and the anchorage grounds.

Submarine Cables Convention.

    2. The submarine cables convention of May 22, 1885 (7 Fed. Stat. Anno. 877) applies only to accidents which happen to cables outside the marine limits of the United States.

---

NOTE.—As to liability for obstruction of navigation by cable, see note in 59 L.R.A. 75.

West India & P. Teleg. Co. v. The "Legazpi."

Obstruction to Navigation—§ 5263, Rev. Stat. Comp. Stat. 1913, § 10072.

    3. A cable laid prior to the American occupation of Porto Rico comes within the policy of § 5263 of the Revised Statutes, which provides that telegraph lines shall not obstruct navigable waters.

Res Ipsa Loquitur.

    4. The doctrine of res ipsa loquitur does not apply where a person having a right to do a thing does it unintentionally or accidentally.

Failure to Produce Witness—Presumption.

    5. Where the testimony of a witness would be cumulative, there is no presumption that his testimony would be unfavorable to the party who could have called him.

Contributory Negligence.

    6. A cable company which maintains its cable across a regular ship channel without giving any warning of its existence at such place is guilty of contributory negligence in a case where the cable was fouled by the accidental falling of a ship's anchor.

Opinion filed June 4, 1915.

## Statement of Facts.

The libel in this case was filed January 22, 1915, by a corporation claiming to be organized under the laws of the Kingdom of Great Britain, and operating a submarine cable under a franchise granted by the Spanish government. It alleges that the Spanish steamer Legazpi on October 30, 1914, negligently dropped her anchor as she was leaving the port of San Juan, and that the anchor became entangled in a submarine cable of the libellant, injuring it greatly and interrupting communication between the San Juan office and the Jamaica office of the libellant for several days. That the resulting damages were upwards of $2,500. The usual monition and attachment followed, the claimant appeared, and, giving bond, took the place of the respondent vessel in the litigation. On March 17 the claimant filed exceptions, alleging, first, that the cause of action set forth

VIII. Porto Rico—9.

is not an admiralty and maritime cause of action, and second that no negligence is shown on the part of the officers or crew of the steamship. An answer accompanied the exceptions, denying upon information and belief the franchise of the plaintiff, and admitting the other substantial facts of the libel except that it expressly denies negligence on the part of the officers or crew of the vessel, and further denies the damage claimed. On March 17 the Compañia Transatlantica Española filed a cross libel against the West India & Panama Telegraph Company, Ltd., alleging that on the occasion set out in the libel an anchor of the Steamer Legazpi became entangled with the cable of the cross respondent, and the vessel was injured to the extent of $1,000. That the existence of the cable in question in the channel of the San Juan harbor endangers the lives of the passengers of the steamships of the cross libellant, eight or ten in all, calling at the port of San Juan. That there is no notice or sign indicating the position of the cable and that it is an obstruction to navigation, contrary to the laws of the United States. After different proceedings in this cause, the case was tried April 16.

Upon the trial it was shown that the cable was laid under a permit or franchise of the Spanish government dated 1868, and the original permit only related to a cable from Porto Rico to Cuba and thence to Central America. How the franchise came into the possession of the libellant was not shown, but there is no contest as to the right of the libellant in this regard. Senate document No. 429 of the fifty-sixth Congress, first session, contains the report on the military telegraph lines in Porto Rico by Brigadier General A. W. Greely, and gives such papers as are known from the royal decree of February 26, 1867, containing conditions to that of May 28, 1868, under which it seems

FEDERAL REPORTS. 131

West India & P. Teleg. Co. v. The "Legazpi."

the construction was actually made. This gives a monopoly for forty years. Article 7 is as follows:

"The traject or line of transit of the cables which must accomplish the object of placing the said islands in perfect telegraphic communication between themselves and with the points indicated is left to the choice of the company, which shall construct for that purpose such land lines as may be necessary to effect the union of the cables. Should such lines, erected at the cost of the government, be already in existence, the company may add thereto the necessary wires for their own service after obtaining the proper official authorization.

"Such portion of the line as it may be necessary to construct in Spanish territory in order to connect the submarine cables with the land station or with other telegraphic lines cannot be employed in the transmission of telegrams unless for the private service of the company between two points of the said territory whenever previously acquired privileges shall be opposed thereto."

A royal decree of August 6, 1868, countersigned by Tomas Rodriguez Rubi, minister of the colonies, concedes "permission unto D. José de Caceres for the fixing upon the coasts of the islands of Cuba and Porto Rico, and for the establishing and working for his own account, the submarine telegraph cables referred to in my decree of the 28th of May last, and the sheet of conditions of same' date:" How this concession came to embrace the franchise from Porto Rico to Jamaica, and how this passed to the libellant, was not shown. Nor was any plan shown giving the route of the original line at that or any subsequent time. This, however, was not contested, and it was shown that the libellant cable company maintains a cable to St. Thomas

and the one in question to Jamaica, both coming into the harbor of San Juan between Morro Castle and Leper Island. The cable from St. Thomas is shown to be laid in the shallower water east of the ship channel, while the one to and from Jamaica enters on the west side of the ship channel, and at the place of the accident, opposite the foot of San Francisco street, San Juan, crosses the ship channel, and, joining the St. Thomas cable, both reach the shore at and in a cable house or hut built for that purpose near the foot of San Francisco street. The Jamaica cable in question was shown to cross lying in the silt or mud at the bottom of the channel, and not to be suspended above the bottom. The officers of the ship had no knowledge of the existence of the cable. The anchor was, just prior to the accident, suspended about 9 feet above the water, ready to drop in case of any accident, as is usual with ships entering or leaving port, but at the time in question dropped accidentally, without the action of anyone on board the ship.

The case was argued at the time and submitted upon briefs on the libel, exceptions, and answer. There was no submission upon the cross libel.

*Messrs. Savage & Francis* proctors for libellant.

*Mr. H. G. Molina* proctor for claimant.

HAMILTON, Judge, delivered the following opinion:

1. The first exception raises the question of jurisdiction in admiralty. The harbor of San Juan from the ocean to the

West India & P. Teleg. Co. v. The "Legazpi."

anchorage grounds and beyond is within Federal admiralty jurisdiction, and the accident occurred within those limits.

"Where waters are navigable and form a highway over which passes or may pass commerce between the several states and so on to the ocean and to foreign lands, then the waters are public navigable waters of the United States and within the admiralty and maritime jurisdiction." Benedict, Adm. 4th ed. p. 127, citing Maloney v. Milwaukee, 1 Fed. 611.

"The United States, by the first act of Congress in relation to the judiciary, passed September 24, 1789, declared that the admiralty and maritime jurisdiction extended to 'all waters navigable from the sea by vessels of 10 or more tons' burthen.' This language has disappeared from our statutes. It had become so thoroughly settled that the admiralty jurisdiction extended over such waters that on the revision of the statutes of the United States in 1873 these words were omitted in the revision, the other words giving the district courts jurisdiction over 'civil causes of admiralty and maritime jurisdiction' being considered all that was necessary to cover this clause as to seizures. But the early act is none the less valuable as a contemporaneous construction." Benedict, Adm. 4th ed. p. 133.

"The jurisdiction can depend upon nothing, in matters of contract, but the subject-matter, the nature and character of the controversy. If that be connected with ships and shipping, commerce and navigation, the admiralty has jurisdiction, otherwise not. In matters of tort it can depend upon nothing but that the wrong occurred upon the sea, or upon navigable waters, the places where maritime commerce is had are the places over which the admiralty has jurisdiction of wrongs. 'Toutes affairs

relatives à la navigation et aux navigateurs appartient au droit maritime.' " Benedict, Adm. 4th ed. p. 139.

The exception, therefore, is not well taken.

2. Reference was had upon the argument to the convention for the protection of submarine cables proclaimed May 22, 1885, between the United States, Great Britain, France, and other countries. 7 Fed. Stat. Anno. 877. This, in article II., covers "culpable negligence, and resulting in the total or partial interruption or embarrassment of telegraphic communication," and the like. There are provisions that owners of ships who can prove that they have sacrificed an anchor to avoid injuring a submarine cable are to indemnified. The United States has given effect to this convention by an act of February 29, 1888, 25 Stat. at L. 41, chap. 17, Comp. Stat. 1913, § 10087, which enacts the provisions of the convention in the shape of a statute. This statute, however, on its face (§ 12) applies only to cables to which the convention applies, and the convention applies only to cables outside the territorial waters of a country. (7 Fed. Stat. Anno. 877, art. 1.) Article 8 even provides that the courts competent to take cognizance of infractions shall be those of the country to which the infringing vessel belongs,—which in the case at bar would be Spain.

Both the convention and the statute on their face apply outside the marine limits of the United States, while the libel in question relates to an accident occurring within the territorial limits of this country.

3. In the year 1866 the Congress of the United States passed an act which has now become § 5263 of the Revised Statutes, Comp. Stat. 1913, § 10072, prescribing the method in which telegraphs shall be laid. That section is as follows: "Any

telegraph .company now organized, or which may hereafter be organized, under the laws of any state, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by law, and over, under, or across the navigable streams or waters of the United States; but such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads."

The statute on its face includes submarine cables. The question is raised whether it applies to a British cable laid in Porto Rico prior to the American occupation of 1898. The United States by the treaty of Paris succeeded to the rights and duties of Spain, and, furthermore, expressly agreed to maintain unimpaired all rights of private property. In the case at bar the United States has not interfered in any way. They have not directed the relaying of the cable, but the cable has been all during the American occupation in use, sometimes by the United States government itself, and must be held to be fully recognized. There is nothing to show, however, that the exact location of the cable under water, and in particular the fact that it crosses the ship channel, was known to the Federal government. The act of 1866 is in many respects inapplicable to the case at bar. It requires a telegraph company, before exercising powers conferred, to file a written acceptance to the Postmaster General. It, however, is not material that some of the provisions of the act do not apply to submarine cables. This is to be expected. At least the police provision as to not obstructing navigation by

telegraphs laid under navigable waters of the United States does apply. The police rule as to not obstructing navigable waters, might well be the expression of the law of negligence between private individuals if there was no statute on the subject. It would come under the maxim *sic utere suo ut non lædas alienum* common to all systems of jurisprudence.

4. The question comes up, therefore, not as to government recognition, but as to the rights of private parties. It would seem that the obligation to maintain a cable in such a manner as not to obstruct navigation must be as binding upon corporations antecedent to the American occupation as to those organized since that time. It is a police regulation over all existing cables for the benefit of commerce. It is true that the original permit gave the right to the company to select the location for laying the cable. There is nothing to show that the representatives of the Spanish government knew exactly where the cable was laid relative to the channel, and, even if the location had been authorized by the Spanish government, they cannot be held to exempt the cable company from damages now growing out of the improper location, if the location was improper.

5. If, therefore, the cable across the ship channel obstructed the navigation of that channel, the case would come within the principle of the City of Richmond, 43 Fed. 85. In that case cables were laid upon a mud bank in front of a ship pier in Hoboken, and the vessel having the right to use the pier backed through the mud and broke the cables which were lying upon this mud bank. The principle of that decision is that a body of navigable water is designed primarily for navigation, and that, if a cable is laid on the bottom, it must nevertheless be so laid as to offer no obstruction to navigation by vessels. If it

does interfere with navigation, the burden is upon the cable company to show its lawfulness.

In the case at bar, however, the issue is not so simple. The ship did not foul the cable while navigating the channel. The cable never touched the ship, and apparently had been there for almost fifty years without ever touching a ship. Ships have come and ships have gone, and the cable has lain there quietly performing its commercial duties and connecting the islands of the West Indies. If the Legazpi had not cast anchor at that particular spot, there would have been no trouble. The question therefore is, Had the Legazpi the right to drop anchor at that spot?

There is no question that the *situs in quo* was not an anchorage ground. There is a large ground expressly provided for vessels some distance up in the harbor of San Juan, and the scene of the accident is merely a part of the channel by which the harbor is approached. The fact that there was no sign indicating that this was a cable crossing would seem to play no part in the matter of dropping the anchor. The ship did not intentionally drop anchor here, and so a sign would not have prevented the accident.

A ship cannot be said to be equipped unless she has anchors, and the Legazpi at the time in question properly carried her anchors ready to trip at any moment, so as to stop and hold her in an emergency. If the cable had not been at the precise point it was, the dropping of the anchor would have made no difference.

6. There is invoked the principle of *res ipsa loquitur*. This is "often used in actions for injury by negligence where no proof

of negligence is required beyond the accident itself, which is such as necessarily to involve negligence." Bou. Law Dic., s. v.

The doctrine is applicable in admiralty as well as in other cases. The Joseph B. Thomas, 81 Fed. 578. The general rule as laid down by Chief Justice Erle, is: "Where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care." Scott v. London Dock Co. 3 Hurlst. & C. 596, 601. An anchor does not usually drop unless the men in charge drop it. It was perfectly proper in the case at bar for the anchor to be held in suspense, so to speak, so as to be dropped at a moment's warning. It is agreed that it was not let go on purpose, and so the fall must have occurred through a defect, jar, or some insufficiency in fastening it. That there was negligence, however, cannot be assumed. Something might have broken or given way beyond the power or control of the ship, and, in point of fact, the testimony for the claimant is that the cause was unknown. Moreover, if it was right to carry the anchor in this position, it would be right to drop the anchor for the ship's purposes anywhere in an apparently clear channel. Dropping it at most could injure no one but the ship itself. If a person has a right to do a thing and does it accidentally, it cannot be said that the maxim of *res ipsa loquitur* applies.

7. The libellant contends that there is a presumption of negligence to be indulged because the claimant did not produce upon the hearing the first officer, who was in charge of the anchor at the time of the accident. There is no doubt of the rule that the

nonproduction of a material witness raises the presumption that his testimony would be unfavorable. Gulf, C. & S. F. R. Co. v. Ellis, 4 C. C. A. 454, 10 U. S. App. 640, 54 Fed. 481; Blatch v. Archer, Cowp. pt. 1, 63, 65 (Mansfield). The officer in charge of the anchor could, so far as appears, have been made a witness. It is not clear, however, that there should be any such presumption in the case at bar. This is not an instance of there being no evidence upon a material point as to which evidence could be procured. The captain was in supreme control, and testified that the anchor was secured in the usual manner, and that the trip securing it was in his view from the bridge. The testimony of the officer in charge would, so far as appears, have been at most only fuller and possibly cumulative.

8. The same result would be reached in this case even if it were shown or presumed that there was negligence on the part of the ship. If the cable company, under its franchise, had, during the preceding night, laid the cable across the channel in the manner it was found, and given no notice to shipping, it would, in the case of accident occurring as under the facts here, have been guilty of contributory negligence. The fact that the cable had been in this position for over forty years makes no difference in the result. It was out of sight and time had put it out of mind. It is questionable if the present public authorities knew that the cable was across the channel, and certainly the owners and officers of the ship did not know its location. Therefore, even if the ship were negligent, the libellant contributed to the accident by maintaining a cable across the regular ship channel. The law will leave the parties where it finds them.

As this necessitates the dismissal of the libel, it is unnecessary

West India & P. Teleg. Co. v. The "Legazpi."

to discuss the question of damages. Nor will the cross libel be considered. It was not pressed or submitted upon the hearing.

A decree will, therefore, be entered overruling the exceptions to the libel and dismissing the libel, and it is so ordered.