### In re RAPID TRANSIT FERRY CO.

### In re CENTRAL R. CO. OF NEW JERSEY.

(District Court, S. D. New York. June 17, 1903.)

1. COLLISION—STEAM VESSELS CROSSING—VESSEL LEAVING SLIP.

Evidence considered, and *held* to establish the fault of each of two ferryboats for a collision in East river as one was leaving her slip and the other was approaching on a crossing course to enter an adjoining slip; the first (1) for not remaining within her slip until the other was out of the way, (2) in proceeding forward at full speed when the vessels were in a position to be in danger of collision from such movement, and (3) in not reversing when it became obvious that the other would not yield the right of way; the second (1) in failing to keep a good lookout, (2) in failing to hear the signal of the other, (3) in failing to see that the other had started from her slip until she was some distance, (4) in failing to give the other a timely signal that she intended to cross her bow, and

(5) in failing to reverse immediately, when it became apparent that the other was attempting to cross her bow.

2. SAME—LIMITATION OF LIABILITY—PRIVITY OF OWNER.

The fact that a ferry company having control of two adjoining slips at a dock, one of which was used by its boats, leased the other to another company operating a ferry line, so that the boats of the two lines were obliged to cross each other's courses in entering and leaving their slips, does not make it privy to a collision between boats of the respective lines brought about by negligent navigation by those in charge, so as to deprive it of the right to a limitation of liability under the statute.

3. SAME.

A ferry company is not privy to a collision occurring through the fault of one of its boats, so as to deprive it of the right to a limitation of liability because it did not promulgate special regulations for the navigation of its boats, such navigation being governed by the rules established by law.

4. SAME.

It is the duty of the owner of a steam ferryboat under Act June 7, 1897 (30 Stat. 102, c. 4, § 2, 2 Supp. Rev. St. 1892–1899, p. 626 [U. S. Comp. St. 1901, p. 2884], to post the inspectors' rules in a place where they can be conveniently read; but the failure to do so does not render such owner privy to a collision, and deprive him of the right to a limitation of liability on account thereof, where the collision did not result from the want of knowledge of the rules by the pilot, but from his failure to observe rules of which he had knowledge.

In Admiralty. Petitions for limitation of liability for a collision.

Lester W. Clark (Charles C. Burlingham, of counsel), for Rapid Transit Ferry Company.

De Forest Brothers and Benedict & Benedict (R. D. Benedict, of counsel), for Central Railroad Company of New Jersey.

Butler, Notman, Joline & Mynderse (F. M. Brown, of counsel), for Staten Island Railway Company, owner of the Northfield.

J. Parker Kirlin and Eliot Tuckerman, for third party claimants, represented by numerous proctors.

ADAMS, District Judge. On the 14th day of June, 1901, at about 6 o'clock P. M., a collision occurred between the ferryboats Northfield and Mauch Chunk, in the vicinity of pier 1 East River, resulting in the sinking and total loss of the Northfield, the drowning of three of her passengers and serious injury to others and loss of property on board. The Mauch Chunk was very little injured and no lives or property of passengers on her were lost, nor was any one injured.

On the 27th of June, 1901, the Rapid Transit Ferry Company, the charterer in control of the Northfield, filed its petition herein for limitation of liability, alleging that the Northfield left her ferry slip at the foot of Whitehall Street, New York, at 6 o'clock P. M. on the day in question with a considerable number of passengers and some vehicles on board, bound for St. George, Staten Island, after blowing the customary long whistle to indicate that she was about to start; that the weather was clear and a strong flood tide prevailed; that as she was moving slowly out, the Mauch Chunk was

¶ 2. Limitation of shipowner's liability, see note to The Longfellow, 45 C. C. A. 387.

seen on the Northfield's starboard beam, and distant a quarter of a mile or thereabouts, heading in an easterly direction; that thereupon the Northfield gave a signal of two whistles to which the Mauch Chunk replied with two; that the engines of the Northfield were thereupon hooked up, her course directed to port and she continued on under a jingle bell; that notwithstanding the exchange of signals the Mauch Chunk did not appear to check her speed or change her course to port and accordingly the pilot of the Northfield gave the Mauch Chunk a second signal of two whistles and blew alarm signals in order to attract her attention; that it would have been dangerous to have stopped or backed at this time and the Northfield accordingly kept on at full speed; that there was ample room for the Mauch Chunk to pass astern of the Northfield but instead of directing her course to port, as her two blasts signaled, the Mauch Chunk came on at full speed, apparently under a port helm and struck the Northfield a violent blow just forward of the Northfield's starboard paddle box, cutting her down to the turn of the bilge and penetrating the hull 6 or 8 feet at a distance of five or six feet below the water line; that at the time of the collision, the Northfield's stern was a length and a half or two lengths clear of the end of the easterly ferry rack. Then followed allegations of fault against the Mauch Chunk in several particulars, which will be noticed hereafter, and the ordinary averments necessary to contest the petitioner's liability and to sustain a petition of this character, including a description of actions brought and claims made against the petitioner by parties who were on the Northfield and suffered personal injuries and losses. through the collision.

On the 4th of October following, the Central Railroad of New Jersey filed its petition herein for a similar limitation of liability, alleging that, on the day in question, the Mauch Chunk left her slip at Communipaw, Jersey City, New Jersey, with a considerable number of passengers and some vehicles on board, bound for the foot of Whitehall Street, New York, where she was due to arrive at about 6 o'clock P. M.; that the weather was clear and a strong flood tide prevailed; that the Mauch Chunk was cast off from her bridge about 5:54 o'clock P. M.; that she had clear sailing along her customary route and encountered nothing unusual until about two minutes after 6 o'clock, when she was in a position five hundred feet or thereabouts from the Barge Office and about three hundred feet or thereabouts from the spindle which separates Whitehall Street ferry slip from the Rapid Transit Ferry Company's slip; that at that time the attention of the pilot of the Mauch Chunk was attracted by two whistles from the Northfield; that the latter boat was in her slip on the port side of the Mauch Chunk, moving along her rack and a distance of fifteen feet or thereabouts from the bridge; that in such position the courses of the vessels were crossing and the Northfield had the Mauch Chunk on her own starboard bow, in which position it was the duty of the Northfield to keep out of the way of the Mauch Chunk; that the pilot of the Mauch Chunk, realizing it would be highly dangerous if not absolutely impossible for the Northfield to continue coming out of her slip and across the Mauch Chunk's

bow, thereupon immediately and in rapid succession signaled his engineer to slow down, to stop, to back and to back full speed astern; that these signals were all promptly obeyed by the engineer, who threw his throttle wide open and applied live steam on the last signal; that at the earliest possible moment after giving these signals to his engineer the pilot of the Mauch Chunk gave his first signal in reply to the Northfield's two whistles by sounding the alarm signal, consisting of four sharp blasts; that disregarding this warning signal, however, the Northfield continued coming out of her slip, apparently hooked up, and the pilot of the Northfield again blew two whistles; that the Mauch Chunk immediately blew alarm whistles. again which were answered by alarm whistles from the Northfield; that at the time the Mauch Chunk first blew her alarm signals the Northfield had ample time to heed them, reverse her engines and return to the bridge; that, furthermore, such a manœuvre was the only prudent one for her to execute; that the collision occurred immediately after the last exchange of alarm whistles, or about thirty seconds after the first two whistles of the Northfield; that at the moment of the collision the stern of the Northfield was lapped on her dock about thirty or forty feet, so that it was impossible for the Mauch Chunk to have directed her course astern of the Northfield; that with her stern thus hinged upon the rack, the Northfield's bow was swung up stream at a slight angle by the strong flood tide, thus bringing the two vessels into collision in such a manner as to knock down the gates, stanchions, deck, sheathing and a portion of the hood on the port side of the bow of the Mauch Chunk and break in the planking of the Northfield just forward of her starboard paddle box. Then follows the charges of fault against the Northfield, which will also be noticed hereafter, and the ordinary averments necessary to contest as well as limit the petitioner's liability, as in the petition of the Ferry Company.

Numerous claims were filed to recover damages for the loss of lives, the personal injuries, and injury to property of those on the Northfield. These claimants alleged fault for the collision on the part of both of the Northfield and Mauch Chunk and that both of the petitioners were in privity with the losses and damages caused by the collision and that neither of them was entitled to any limitation of liability.

Answers were duly filed to the petitions of the Ferry Company and the Railroad Company by each other and by the numerous claimants and issues were raised as to the faults of the respective vessels and as to the privity of the Ferry Company and of the Railroad Company with the alleged negligence of their agents on the vessels.

The faults charged against the Northfield by the Railroad Company are:

"1. The Northfield was not under command of a competent person.

2. She did not keep a good lookout.

3. She left her slip without blowing a long whistle, commonly known as a slip whistle.

4. She was started from her slip without her captain first ascertaining if the way was clear.

5. She was put under way at full speed before clearing her slip.

6. While she was within the slip her pilot, or those in charge of her, sighted the Mauch Chunk and blew a blast of two whistles, signifying her intention to cross the bows of the Mauch Chunk while the Mauch Chunk had the right of way.

7. Danger of collision being apparent she did not stop and reverse season·· ably.

8. She did not make due allowance for the direction and force of the flood tide.

9. Instead of waiting in her slip until the Mauch Chunk had crossed the same and made her landing she started from the slip at full speed, thus bringing about the collision.

10. The Mauch Chunk having the right of way, the Northfield, having her on her own starboard hand, was bound to keep out of the way and did not do so.

11. She did not blow one whistle and did not pass astern of the Mauch Chunk, as she ought to have done."

The faults charged against the Mauch Chunk by the Ferry Company are:

"1. The Mauch Chunk was not under command of a competent person.

2. She did not keep a good lookout.

3. She did not direct her course to port, as by her assenting signal of two whistles she had indicated her intention of doing.

4. She was proceeding at an excessive rate of speed in crowded waters.

5. In coming round from the North River she proceeded too close to the Battery.

6. She did not stop and reverse seasonably.

7. She did not make due allowance for the direction and force of the flood tide.

8. Instead of starboarding her wheel, and going astern of the Northfield, or stopping and permitting the Northfield to go out of the slip, the Mauch Chunk came on at full speed, thus bringing about the collision.

9. The Mauch Chunk insisted on attempting to enter her slip without waiting, as is usual and customary, for the Staten Island ferry boat to leave her slip on her voyage to Staten Island.

10. The Mauch Chunk did nothing to avoid the collision.

11. After the collision the Mauch Chunk did nothing to assist the Northfield, but entered her own slip, made her landing and departed therefrom on a voyage to New Jersey without attempting to render any assistance to the vessel which she had run down."

The faults urged against the vessels by the claimants are:

The Northfield.

"1. In starting from the ferry bridge, when her pilot was in a position behind a shed which cut off his view of the Mauch Chunk, at a time when that vessel was entering the East River from the westward, on her usual and known trip, and on a course nearly at right angles with that of the Northfield in leaving her slip.

2. In continuing on her course out of her slip, without having reached a definite agreement with the Mauch Chunk as to the manner in which the vessels should pass each other, under circumstances which left it doubtful that they could pass safely in pursuance of the signals which she gave;

3. In failing, after she had cleared her own slip, to keep out of the way of the Mauch Chunk by stopping and reversing promptly, on seeing that the Mauch Chunk was not checking her headway, or navigating so as to pass under the stern of the Northfield;"

The Mauch Chunk.

"1. In failing to stand by after the collision; from this fact a statutory presumption of her fault arises;

2. In not maintaining a good lookout;

3. In omitting to give proper whistle signals seasonably, or to act properly on those that she did give;

4. In failing to pass under the stern of the Northfield as she might and should have done;

5. In entering the East River and approaching the mouth of the Northfield's slip, at an unlawful and excessive rate of speed, without using the least degree of caution, at a time when it was known the Northfield was scheduled to start out of her slip, and when, if a proper lookout had been kept, it would have been seen that she had started;

6. In failing to slacken her speed, or stop, or reverse seasonably, in the presence of an obvious danger of collision;

7. In that her navigation was in the charge and control of a negligent and reckless pilot."

The Northfield was raised after the collision and valued at $5,000; but as such sum would only partly pay for the expenses of the raising, she had no surrender value. The pending freight moneys required to be surrendered, consisting of ferriage on passengers and horses and wagons, amounted to $25.45 which have been paid into court.

The Mauch Chunk, together with her freight moneys, of the same character as the Northfield's, amounting to $25, was duly surrendered. Subsequently the boat was sold and produced, after deducting expenses of sale, the sum of $41,234.25, which sum, with the freight moneys, making altogether $41,259.25, is in court.

The claims for damages that have been filed greatly exceed these sums.

From the great mass of testimony taken in the cases, much of which is conflicting upon several material points, I gather the following:

The Northfield was a side wheel boat about 210 feet long, with three decks; main, saloon and hurricane. Her two pilot houses were on the hurricane deck, about 22 feet above the water. They were about 110 feet apart and about 50 feet from the bow at each end. Her full speed was about 10 miles an hour. The tide was the last of the flood and running to the eastward between 3 and 4 miles an hour. The easterly rack of the ferry slip running along pier 1, was about 260 feet long and extended about 50 feet out in the river from the bow of the boat as she lay in the slip. The westerly rack was about 100 feet long and extended to about the paddle box of the boat. There was a clear view to the westward from the forward pilot house, embracing the slip of the Mauch Chunk, but from the rear pilot house, such view was obscured by buildings until the boat moved outward some little distance.

When the Northfield was cast off from her bridge, a few seconds after six o'clock, the pilot went into the rear pilot house and sounded a long warning whistle indicating that the boat was about to start. He then started the boat slowly ahead under one bell. He could not see the Mauch Chunk from there, but as the Northfield moved out, and after she had gone 20 or 25 feet, he stepped forward and saw the Mauch Chunk as he left the pilot house. He estimated that she was then about 900 or 1,000 feet away and about 400 feet out from the Battery Wall, coming for the neighborhood of her slip, which was bounded on the west by pier 1. The quartermaster

of the Northfield had been in the forward pilot house for several minutes before the boat started and from there had seen the Mauch Chunk leave her slip at Communipaw. He had put the helm hard aport before the starting and fastened the wheel in a becket. When the Northfield, under the starting bell given by the pilot, had moved out about 30 or 40 feet, so that her forward pilot house was beyond a pavilion, about 170 feet long, on pier 1, and the quartermaster had a clear view up the river also, he blew a signal of two whistles to the Mauch Chunk and hooked his engine up. By this time, the boat was about 75 feet from the bridge and the pilot was then approaching the forward wheel house, which he immediately afterwards entered and remarked to the quartermaster that the Mauch Chunk was not stopping or observing the two whistle signal and he changed the wheel to starboard to throw the stern of the Northfield up the river to the eastward and the bow to the westward, and blew a second signal of two whistles, which was not answered, but both boats then blew alarm signals and they shortly afterwards collided, the Mauch Chunk striking, with her bow, the Northfield on the starboard side just forward of the paddle box. In the meantime, the Northfield had progressed so far up and out in the river that at the time of the collision her stern was clear of pier 1 and her bow had been carried by the tide about 50 feet above the starting place.

The Mauch Chunk started as alleged in the petition of the Railroad Company. She was a propeller, about 160 feet long, with two decks. The pilot houses were on the upper deck, about 25 feet above the water. Her full speed was about 9 miles an hour. As aided by the tidal current, she was making about 12½ miles, as she first approached the Northfield.

She had no lookout. No one on her heard the warning signal of the Northfield or noticed that she was moving out of her slip until she blew the signal of two whistles. What signal was given by the Mauch Chunk in reply to the Northfield's signal of two blasts is greatly disputed. A number of witnesses on the Northfield and other boats in the vicinity testify that the Mauch Chunk blew a signal of two blasts in reply, indicating an intention to permit the Northfield to go ahead, as the latter had requested. On the other hand, those on the Mauch Chunk testify that when they heard the signal from the Northfield, the Mauch Chunk immediately responded with alarm whistles, as the distance between the boats was not great enough to permit the Northfield's passage ahead. Usually more weight is to be given to the testimony of the witnesses on board of a vessel as to what occurred there than to that of witnesses elsewhere and I am inclined to adopt the Mauch Chunk's contention that she did not consent to the proposed manœuvre of the Northfield.

It is contended on behalf of the Mauch Chunk that she was only about 300 feet away when the two blast signal was given by the Northfield. This I doubt. The preponderance of testimony shows that the Mauch Chunk was probably 600 or 700 feet to the westward from the Northfield on a line from 200 to 300 feet to the southward, so that she was about 700 feet away when the Northfield's two blast signal was given and that after this, she approached nearer

her slip, under a starboard helm. But with this distance between the boats, the Mauch Chunk, going, with the tide, about 1,250 feet to the minute, was about a half a minute away from collision, unless she immediately took measures to bring herself to a standstill. She was still under considerable headway at the time the boats came together and it is evident that she did not take measures to stop in time which she should have done, as it was evident that the Northfield intended to try to cross her bow and that it would be impossible for her to do so unless the Mauch Chunk stopped her headway.

I conclude that both vessels were in fault for the collision: ·

### The Northfield.

1. In not keeping within her slip until the Mauch Chunk was out of the way.

2. In proceeding forward at full speed when the vessels were in a position to be in danger of collision from a forward movement of the Northfield.

3. In not reversing when it became obvious that the Mauch Chunk would not yield the right of way.

### The Mauch Chunk.

1. In failing to keep a good lookout.

2. In failing to hear the warning signal of the Northfield.

3. In failing to see that the Northfield had started from her slip until she was about 75 feet from her bridge.

4. In failing to give the Northfield a timely signal that she intended to cross the Northfield's bow.

5. In failing to reverse immediately when it became apparent that the Northfield was attempting to cross her bows.

Considerable stress has been laid in the argument for an exoneration of the Mauch Chunk, upon the fact that the Northfield had the Mauch Chunk on her own starboard side and that it was the duty of the Northfield to keep out of the way of the Mauch Chunk and of the latter to keep her course and speed. It would have been obvious to the Mauch Chunk, if she had fulfilled her duty of seeing the movements of the Northfield from the beginning, that the Northfield was not navigating according to the starboard hand rule and that she intended to go ahead. She could not possibly go under the stern of the Mauch Chunk, as the force of the tide, notwithstanding anything the Northfield could do, necessarily carried her up the river and across the course of the Mauch Chunk, so that the rule, if it applied to the case of the steamboat just leaving her slip, afforded no excuse to the Mauch Chunk here. Moreover, if the rules came into operation immediately upon the Northfield leaving her bridge, the Mauch Chunk was not navigating in conformity with them, as instead of keeping her course and speed, she starboarded her helm and changed her course to the port, after the Northfield started. The main cause of the collision, in my judgment, was the assumption on the part of the Northfield that the Mauch Chunk would give way to her and the failure on the part of the Mauch Chunk to observe what the Northfield was attempting to do and to

reverse in time to avoid the collision. It was a clear case of negligence on the part of both of the boats.

The principal difficulty in the case is to determine whether the petitioners are entitled to limit their liability.

The Act under which the petitioners claim the right to limit provides (Rev. St. [2d Ed.] p. 827, § 4283 [U. S. Comp. St. 1901, p. 2943]):

"Sec. 4283. The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, lost, damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The object of the law has been authoritatively declared in Norwich Company v. Wright, 13 Wall. 104, 121, 122, 20 L. Ed. 585, as follows:

"In view of the fact that the limited liability of ship-owners was, by the general maritime law, extended to all acts of the master except contracts for the benefit of the ship, and in most places even to these; and of the fact, that the English statutes expressly extended it to cases of collision as well as to injuries to cargoes; we see no reason why the fair and natural construction should not be given to the act of 1851, which makes an equally broad application of the rule, and there is nothing in the reason of the thing that should lead us to evade such a construction. The great object of the law was to encourage ship-building and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring and enterprise, but they have little capital. On the other hand, those who have capital, and invest it in ships, incur a very large risk in exposing their property to the hazards of the sea, and to the management of seafaring men, without making them liable for additional losses and damage to an indefinite amount."

The general expressions used by Mr. Justice Bradley, in thus stating the objects of the law, referred particularly to the hazards incurred in the use of ships and by sea ventures and the Act, as at first passed, excluded from its benefits the owners of vessels of any description used in rivers or inland navigation, (Id. § 4289) but in 1875 and 1886 it was extended to all vessels used on lakes or rivers or in inland navigation, including canal-boats, barges and lighters (U. S. Comp. St. 1901, p. 2945) and the original Act always covered the vicinity of this collision, as the waters of the East River belong to the coast waters of the United States (The Garden City [D. C.] 26 Fed. 766). Corporations are regarded as individuals and the reason of the rule applies in a case of this kind. The petitioners are, therefore, as much entitled to the protection the Act gives as if the collision had occurred between ships in a remote place, provided it appears that there was no privity or knowledge on their part in the acts of negligence causing it.

Such privity or knowledge on the part of the Ferry Company, is urged by the claimants in several particulars, viz.:

"1. It voluntarily and without lawful authority permitted the other petitioner to use and occupy, for ferry purposes, the easterly one of the two slips

which it leased and controlled, under circumstances which made it necessary for its own boats to cross the course of the boats of the other petitioner at frequent intervals, in a manner attended by danger of collision, without establishing or promulgating, as it had the power to do, rules and regulations to avoid the danger which it knew resulted, and was liable to arise at or about the hour of the day when the collision occurred;

2. It knowingly permitted the pilot, in a negligent manner, to start the boat from the ferrybridge while he was standing on the stern of the boat behind a shed which cut off his view of vessels rounding the battery from the westward, and at a time when it was known the Mauch Chunk was due to arrive at her slip and was probably approaching it."

1. It appears that the Rapid Transit Ferry Company had actual control of the slip next to its own and leased it to the Central Railroad Company of New Jersey. There can be no question, as far as this case is concerned, of the lawful occupation of the slip by the Railroad Company.

There was no authority on the part of the Ferry Company to make regulations for the government of the Railroad Company's boats. The navigation of the boats was governed by law, over which the lessor has no control.

2. This question would be an important one, if it did not appear that the negligent act, which the company was alleged to be in privity with, was not a cause of the collision. The starting of the boat by the pilot from the rear pilot house was undoubtedly negligent, and it is not clear that such negligence was not participated in by the company whose responsible agents on shore were, or should have been, cognizant of the method of proceeding which was usually employed—The Republic, 61 Fed. 109, 9 C. C. A. 386—but the negligent act which precipitated the collision, was not the starting of the boat, but her continuance, with an accelerated speed, out beyond the confines of her slip. Until the pilot reached the forward pilot house, the movements of the boat were under the control of the quartermaster. If instead of ringing up full speed, after the boat had progressed a short distance from the bridge, he had stopped the engine, or if necessary reversed it, the boat would not have gone out into the waters where she collided but remained within the protection of the slip. The negligence which brought about the Northfield's share in the disaster, was the negligence of those navigating the boat when she was entirely beyond the control of the petitioner's agents on shore.

It is also urged by the claimants that the Railroad Company was in privity with its agents in the following particulars:

"1. It was operating a ferry to and from a slip next adjacent, to the eastward, of Pier 1, East River, without lawful authority, by virtue of an agreement with the petitioner, the Rapid Transit Ferry Co., under which it was necessary for its boats to cross, at frequent intervals, the mouth of the slip used by boats of the Rapid Transit Company in circumstances of danger; and that it neglected to establish or promulgate needful rules or regulations to avoid the danger that it knew resulted, or was liable to arise, at or about the hour of the day when the collision occurred;

2. It failed to have the regulations for the prevention of collision posted up in the pilot-house in a place where they could be read by the pilots.

3. It maintained in the command and control of the Mauch Chunk a pilot whom it knew to be reckless and unfit for the position."

1. The question to be determined is not whether the ferry was being legally operated. The company had a right to use their boats upon the public waters and to seek landings for them at convenient places. The navigation of the boats was governed by law, as in the case of the Ferry Company, and the petitioner is not in fault for the absence of special regulations for its own boats.

2. The Act of June 7, 1897—30 Stat. 102, c. 4, § 2, 2 Supp. Rev. St. 1892–1897, p. 626 [U. S. Comp. St. 1901, p. 2884]—provided for the furnishing of the Inspectors' Rules to ferry boats and steam vessels and for their posting in "conspicuous places" in such vessels.

It appears that the rules were tacked up on the ceiling of the pilot house over the heads of the navigators. The pilot, in excuse for his failure to fully state the rules·on his cross examination, testified that he had never studied them a great deal, because they were not posted where he could see them.

It was the duty of the petitioner to provide for a compliance with the law regarding the posting of the rules and such a compliance involved posting them where they could easily be read but I cannot conclude that the pilot in this case was incompetent because of any inability to see the rules by reason of their position. He had been master of steamboats for 27 years and by his testimony showed a reasonable familiarity with the text of the rules. It was not because the pilot did not know the rules that he participated in the faults of the collision but because he neglected to apply those which he knew very well, requiring him to give a whistle signal of his proposed course and to stop and reverse the engines of his boat in time.

3. There is no evidence that the petitioner knew the pilot to be reckless or unfit for his position, or that he was so.

I must, therefore, hold that the allegations of privity or knowledge on the part of the petitioners are not sustained.

Decrees will be entered limiting the liability of the petitioners, and holding both of them liable to the extent of the surrendered values of the colliding vessels and freight. An order of reference will also be entered to ascertain the extent of the claims of the parties who have suffered loss by the collision.