## THE MAUCH CHUNK.

### THE NORTHFIELD.

#### (District Court, S. D. New York. July 5, 1905.)

1. COLLISION—DAMAGES—FUNERAL EXPENSES OF PERSONS KILLED.

The funeral expenses of persons whose death was caused by collision are recoverable as part of the damages against the vessel in fault, where the law imposes liability for the same on the relatives for whose benefit the suit is brought.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Death, § 110.]

2. SAME—OBSTRUCTION OF DOCK.

The sinking of a ferryboat in collision near the end of a pier, where she remained for some days before being raised, *held* on the evidence not to have prevented the use of the pier, so as to entitle the owner to damages.

3. SHIPPING—PROCEEDINGS FOR LIMITATION OF LIABILITY.

In proceedings brought by two separate vessels to limit liability for a collision, and in which both are found in fault, the cost of raising one which was sunk in the collision in a place where it was an obstruction to navigation is a proper claim against the fund for distribution although it exceeds the value of the raised vessel.

[Ed. Note.—Limitation of shipowner's liability, see The Longfellow, 45 C. C. A. 387.]

4. SAME—PRIORITY BETWEEN DAMAGE CLAIMANTS.

Under Rev. St. § 4286 [U. S. Comp. St. 1901, p. 2944], relating to proceedings for limitation of liability, which provides that for the purpose of such proceedings a charterer who is required to man, victual, and navigate a vessel at his own expense shall be deemed the owner, and that a vessel under such a charter "shall be liable in the same manner as if navigated by the owner thereof," where in proceedings by such a charterer both vessels have been found in fault for a collision, and each condemned to pay half the damages, and the charterer has been required to contribute the value of his vessel and pending freight, and also the cause of action against the other vessel, the claims of third party claimants arising out of the collision are entitled to priority of payment from the fund over the claim of the owner for loss or damage to his vessel.

In Admiralty. On exceptions to commissioner's report.

De Forest Bros. and George Holmes, for Central Railroad Co.

Butler, Notman & Mynderse, for Rapid Transit Ferry Co.

Thomas D. Rambaut, J. Parker Kirlin, Convers & Kirlin, William C. Wolf, and Nathan Burkan, for various claimants.

ADAMS, District Judge. These actions were decided on the merits June 17, 1903—124 Fed. 786—and referred to a commissioner to examine the claims, &c. He now reports that there were 53 claims filed and testimony presented in 39 of them. Exceptions to his report have been filed in a number of the cases, mainly directed to the amounts reported. I have examined the matters involved carefully and conclude that the commissioner has been very conservative in his estimates of the losses and as he had the witnesses before him, I do not think it would be proper for me to take up anew the questions of amounts.

There are a few questions, however, which require attention at my hands.

In the cases of deaths resulting from the collision, the commissioner has allowed funeral expenses, in addition to damages. It is claimed that the statute does not cover such items and reference is made to Dalton v. South Eastern Ry. Co., 4 C. B. (N. S.) 296; Boulter v. Webster, 13 Weekly Reptr. 289; Holland v. Brown (D. C.) 35 Fed. 43, 49, and Consolidated Traction Co. v. Hone, 60 N. J. Law, 444, 38 Atl. 759.

A matter of the same kind has, however, been passed upon in this court and such expenditures allowed. The Catskill (D. C.) 95 Fed. 700, 701. And in Murphy v. N. Y. Cent. & Hudson R. R. Co., 88 N. Y. 445, the question was considered in connection with the law of England, referred to in Dalton v. South Eastern Ry. Co. and Boulter v. Webster, supra, and it was held that in this state and country, such expenses can be recovered if the law imposes upon the relatives for whose benefit the suit is brought the obligation to bear them. In the Catskill, supra, which was an action resulting from a collision between two vessels and limitation of liability on the part of the owners being sought, as here, the funeral expenses of the deceased were specifically allowed. Judge Brown there said (702, 703):

"3. It is further contended, inasmuch as by the law of the states of New York and New Jersey no liens are given for death claims, while a maritime lien does exist for the damages received by the Catskill, that this entitles the Catskill to a priority for her claim over the death claims. I cannot sustain this contention. Section 4284 of the Revised Statutes [U. S. Comp. St. 1901, p. 2943], providing for the distribution of the proceeds upon a surrender of the vessel, declares that the proceeds shall be distributed among the claimants "in proportion to their respective losses'; and no distinction is made between the different kinds of damage, whether to property or person. Injuries to person and loss of life are held to be claims within the scope of the statute (In re Long Island North Shore Passenger & Freight Transp. Co., 5 Fed. 599, 624; Butler v. Steamship Co., 130 U. S. 527, 552, 9 Sup. Ct. 612 [32 L. Ed. 1017]), and recovery in personam against the owners of the vessel for loss of life is restrained upon the surrender of the vessel in proceedings under the statute (section 4285 [U. S. Comp. St. 1901, p. 2944]).. It is evident, therefore, that the statute not only makes the fund derived from the sale of the vessel a fund applicable to all claims pro rata (see, also, rule 55 in admiralty), but that it bars all other remedy. The necessary effect of this is to make every admissible claim a statutory lien upon the fund. The fund must be distributed, therefore, according to the statute itself, i. e., pro rata among the claims arising from the collision (Butler v. Steamship Co., supra; The Maria and Elizabeth, 12 Fed. 627), saving any special equitable rights as between the parties."

Another question arises out of the claim of the Compania Transatlantica for damages caused by the alleged obstruction of that company's pier, 10 East River, by the sinking of the Northfield across the end of the pier.

The commissioner says in connection with this claim:

### "Claim of Compania Transatlantica.

This claimant, which operates a line of steamships between New York and Ports in Spain, the Philippines and Mexico, was the lessee of pier 10, East River, and had the right to use one-half of the slip on each side of the pier. The claim is in the nature of wharfage, the statement filed alleging that the Northfield sank at the end of pier 10, where she remained several days, during which time the hawsers were run from her to the end of pier 10, and the pier was otherwise used by the owners of the sunken ferryboat and by men engaged in raising her, and their lighters, barges and other craft made use of both sides of pier 10, whereby access to and use of the pier and slip were rendered impossible, and the claimant suffered a loss of $1,500.

When the berths were unoccupied by the claimant's steamships, it let them out to such vessels as applied for them. The Northfield lay sunk a little distance off pier 10, from about 6 o'clock in the evening of June 14 until about 9 o'clock in the morning of June 20, 1901, when she was raised and removed. During this interval her upriver end was further off than the downriver, which was some 15 or 20 feet away from the lower corner of the pier. The downriver end extended across the mouth of the slip between piers 9 and 10 for a good part of its width, while the upriver end was about on a line with the upper side of pier 10. The testimony satisfies me that the Northfield would have prevented the use of the claimant's berth on the lower side of pier 10, but not the berth on the upper side, although the presence of the wrecking outfit would have embarrassed the use of the upper berth if a vessel had attempted to dock there. None of the claimant's vessels were in port during the period in question, but an attempt was made to prove that the berths had been let to other vessels which would have used them, and that these engagements had to be cancelled because of the obstructions. The only distinct testimony to that effect was from a Mr. Palmer, in the employment of claimant's agents. He had charge of the making of arrangements for docking, and says that there were two vessels, a steamship and a bark, that would have occupied the berths, but were unable to come there because the slips were blocked; they were each to pay $50 per day. The value of this testimony was, however, so much impaired on cross-examination that I do not think that I would be justified in finding the facts in accordance with the direct testimony of the witness, especially as time and opportunity were afforded for corroborative testimony and none was furnished. The testimony shows, however, that use was made of the pier in the wrecking operations, lines being run from the ferryboat to the end of the pier, on which were also landed carts, wagons, benches and other articles taken from the ferryboat. There is testimony that about one-fourth of the pier was thus used, but it also appears that the lines were run and the pier used by the Merritt & Chapman Wrecking Company, which raised the Northfield. The petitioner did not employ the wrecking company, and does not appear to have participated in its operations. Indeed, there is nothing to show that this use of the pier was without the consent of claimant. If consent was given, the claim would be on an implied contract against the wrecking company. If it was not given, and the use of the pier was tortious, the tort would be an independent one on the part of the wrecking company, and not one springing naturally and directly from the collision.

I therefore report that this claim should be disallowed."

It does not seem necessary to add to what the commissioner has said, which meets with my approval and is adopted. The sole testimony tending to support the claim being discredited, there was

nothing upon which action towards the allowance of compensation could be based.

The claim of the Staten Island Railway is strongly pressed for allowance, notwithstanding the relations of that company to the Northfield. The matter has apparently been thoroughly investigated by the commissioner, who says:

### "Claim of Staten Island Railway Company,
—and—
### Claim of The Rapid Transit Ferry Company.

The first of these claims was made not only on behalf of the claimant as sole owner of the Northfield, but on behalf of the Rapid Transit Ferry Company, the charterer thereof, and of the British & Foreign Marine Insurance Company, Limited, and the American & Foreign Marine Insurance Company, the underwriters of the Northfield. The claim alleges that at the time of the collision, the Northfield was operated, navigated and controlled by the charterer, and that the first mentioned of the two insurance companies had insured her in the sum of $25,000, and the other in the sum of $5,000, and that her value was $30,000. The amount claimed was $36,865.42, consisting of the alleged value of the Northfield before the collision, and $8,365.42 alleged to have been expended, or caused to be expended, by the claimant in good faith 'for salving, raising, surveying, docking, making temporary repairs and otherwise,' less $1,500, a sum which, it is alleged, the value of the Northfield did not exceed after these expenses had been incurred. I find from the testimony that the Staten Island Railway Company was the enrolled owner of the Northfield, and that the Northfield was worth $30,000 before the collision. She realized $1,500 after being raised, but more than that amount was spent in preserving her up to the time of the sale. The Merritt & Chapman Company, which raised the vessel, received $5,925 for its services under an agreement with the underwriters which was ratified in writing by the charterer. This ratification also provided that the bill should be a lien on the ferryboat. The bill was paid by the underwriters, which deducted the amount from the insurance money when they settled as for a total loss. Although the Northfield was of no value when raised (in view of the cost of preserving her), I find that the wrecking bill was a proper item of expense, because the Northfield was a menace to navigation as she lay sunk and it was proper to raise her for that reason, and because her true condition and value could not be ascertained until she had been raised.

Prior to the filing of the owner's claim, a claim was filed by the charterer, for $30,000, 'on behalf of the charterers and owners,' for the total loss of the Northfield. The interlocutory decree in the limited liability proceeding of the charterer, however, provided that in addition to the value of the Northfield and pending freight, the charterer should contribute 'the amount or value, if any, of the cause of action against the ferryboat Mauch Chunk and her owners for the loss of the ferryboat Northfield by the said collision.' Under this provision, counsel representing Eliza E. Wrenn and other third party claimants presented testimony relating to the claim of the charterer, after serving notice on the proctor for the charterer that proof of that claim would be made by them if the charterer itself did not make such proof, and after such proctor had, in substance, refused to state whether he would or would not make the proof. At the close of the testimony, however, the proctor for the charterer stated that all the proofs which he could have offered as to his client's claim had been introduced by either the owner or the counsel for third party claimants, and he now contends that the claim of his client is the only claim for the Northfield which should be recognized.

By the terms of the demise, the charterer was required to keep the Northfield in good condition and repair, and at the expiration of the agreement, restore her in as good condition as when received. With other demised boats, she was covered by insurance policies of which the premiums were paid by the charterer. The policies were in favor of the owner, the charterer and a third company, closely allied with them, as interest might appear. The

counsel who presents the claim of the owner concedes that the three companies. had the same offices, that some of the officers of one were officers of the other, 'and that every act of the one binds the other in so far as he has authority to bind it.' The owner and the charterer had the same general manager, the same paymaster and assistant treasurer, who was also the owner's auditor,. and the same general counsel. The latter filed the charterer's petition for limitation of liability, and says that the general manager's position in each company was such that he was authorized to act in all matters connected with the sinking of the Northfield, and with her insurance, and that he was frequently consulted by the general manager from the time of the disaster up to the time the insurance was paid, the consultations including matters relating to the insurance. The receipts of the three companies were intermingled each day, handled by the same man, and by him assigned according to the interests of the respective parties. When the insurance money was paid, the particular average of $150 was deducted by the underwriters in addition to the wrecking bill already referred to, a check was given to the order of the three companies, and the receipt taken was given on behalf of all three companies by Edward Curry, who signed as secretary and treasurer of the owner and as assistant treasurer of the charterer and the third company. In settling among themselves, the amount of the wrecking bill was charged against the owner, $500 of the amount received was credited to the charterer for legal and other expenses incurred by it in the collection of the insurance, and the balance, $22,958.49, went to the credit of the owner. These credits were thus made in accordance with an agreement previously reached among the three companies. As part of this settlement, the owner gave the charterer a general release, purporting to have been executed in consideration of one dollar and other valuable considerations. This release was dated January 13, 1902, prior to the filing of the charterer's claim, and it specifically included 'any matter, cause or thing whatsoever connected with or arising from damage to or loss of the steam ferryboat Northfield.' The testimony of Mr. Clark, who was counsel for both companies at the time, is to the effect that the release of the charterer from any liability it may have incurred to the owner by reason of the collision was the consideration for the charterer's consent that the insurance money should go to the owner. It further appears that in the proceeding of the charterer to limit its liability a motion was made by third party claimants for an order directing the petitioner to surrender its claim to them, and that the counsel for the charterer, in the brief submitted by him on that motion, stated that the charterer, having collected from its underwriters the amount of the loss, was not interested in the litigation further than to establish its right to limit. On this and other testimony showing the close relations between the owner and the charterer, counsel for third party claimants contends that the owner and the charterer were in effect one, that the owner is estopped from alleging that the claim for the loss of the Northfield does not belong to the charterer, and that the settlement of the questions arising out of the disaster, resulting in the release, amounted to an equitable assignment of the owner's claim to the charterer; and he also maintains, on the authority of O'Brien v. Miller, 168 U. S. 287 [18 Sup. Ct. 140, 42 L. Ed. 469], that the charterer was in no position to maintain its limited liability proceeding unless it could surrender the cause of action against the Mauch Chunk. But I do not consider that it is necessary to determine these questions, or whether the insurers' right of subrogation could, without their consent, be extinguished or impaired by the manner in which the owner and the charterer transacted their business as between themselves and adjusted the liabilities arising out of the collision, since my conclusion is that any claim which the owner or the underwriters, as well as the charterer, might have should be postponed to the claims which have been hereinbefore allowed.

The claim of the owner alleges that the collision occurred without fault on its part, or on the part of the charterer or of the navigators of the Northfield, but was due solely to the negligence of the Mauch Chunk. Although the court has since found that both vessels were at fault, and the charterer has limited its liability as owner pro hac vice of the Northfield to the value of that vessel, her pending freight, and the cause of action against the Mauch Chunk for her loss, and the enrolled owner's claim admits that the charterer

was owner pro hac vice, nevertheless counsel for the enrolled owner maintains that his client is entitled to assert a claim for the Northfield's value against the proceeds of the Mauch Chunk on the same basis with third party claimants, and should share pro rata with them in the distribution. His argument is that the rule which prevails in courts of admiralty in this country, by which a vessel demised by charter is subject to a maritime lien for negligent navigation by the charterer's servants, is contrary to natural justice, and should not be extended further than policy and expediency require, and that where the owner, who is in fact innocent, comes into court asking redress from the guilty persons, there is no reason why a fiction of law should be created under which he is to be regarded as guilty. Counsel says that if the owner and other injured parties were suing the charterer in the absence of limited liability statutes, the property of the charterer, if insufficient to satisfy all judgments, would be applied pro rata, without discrimination against the owner, and that this result cannot be affected by the fact that Congress has seen fit to exonerate the charterer from the greater part of its liability. But I think that counsel fails to distinguish between actions in rem and actions in personam, and ignores the language and the purpose of the limited liability statutes. If the owner of the Northfield had brought an action in rem against the Mauch Chunk for the value of the Northfield, at the same time suing on behalf of those who had lost property aboard the Northfield, and a bond had been given for the value of the Mauch Chunk which proved to be far less than the total claims established in the action, the court, having found both vessels in fault, would have decreed that the owner should recover only half its damages, notwithstanding its personal innocence, and that the property claimants should recover their full damages; and the decree would also have provided that the latter claims be paid in full before any payment should be made to the owner of the Northfield. Again, if the third party claimants had libeled the Northfield, and she had been of sufficient value to satisfy such claims, the owner would, in effect, have been required to pay them, his rights as owner being thus subordinated to the rights of such claimants. The mere fact that the Northfield was of no value after the collision, and claims must be collected, if at all, out of the proceeds of the Mauch Chunk, cannot have the effect of destroying this priority. Furthermore, § 4286 of the Revised Statutes, which provides that for the purpose of a limited liability proceeding a charterer shall be deemed to be the owner of the chartered vessel in case he shall man, victual and navigate her at his own expense, also provides that when so chartered the vessel 'shall be liable in the same manner as if navigated by the owner thereof.' This indicates that so far as third party claimants are concerned, Congress intended that the situation should not be changed by the mere fact that the vessel was operated by a charterer. The language of Judge Brown in The Catskill, 95 Fed. 700, appears to be quite as applicable to the case of a charter-operated vessel as to that of a vessel operated by the owner. He says:

'The Catskill, having been held in fault in this proceeding, as well as the St. Johns, is bound jointly with the latter to make good all damage claims; and any amount recoverable from the St. Johns which might otherwise be apportionable to her, on account of her own damage, must be held applicable to make good all outside claims for which she is bound equally with the St. Johns. As between these different claimants the owners of the Catskill are equitably estopped from withdrawing in this proceeding any part of the fund whereby the other damage claimants might lose any part of their demands. The Erinagh, 7 Fed. 235; The Olga, 32 Fed. 329, 331; The Eleanora, 17 Blatchf. 88, Fed. Cas. No. 4335. This is a priority which falls within the scope of rule 55 of the supreme court in admiralty. The insurers stand by subrogation in the shoes of the owners of the Catskill, and can claim no more than her owners could claim.'

And in The St. Johns, 101 Fed. 469 (477), Judge Brown refers to the complex and apparently conflicting relations produced by the right of the insured owner, upon surrender of his vessel, to retain insurance moneys for his own benefit, his obligation to surrender any claim he may have for damages to

his vessel, and, on the other hand, the insurers' right of subrogation to the same claim; and he then says:

'But in the case of The City of Norwich, 118 U. S. 468, 506, 6 Sup. Ct. 1150, 30 L. Ed. 134, it is in effect stated that the insurers' right of subrogation is subordinate to the rights of the damage claimants, who must first be paid in full (The Albert Dumois. 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751); so that the insurers, with the rights only of the assured, take what is left of the indemnity fund after the damage claims are satisfied.'

Judge Brown also held in The Catskill, supra, that claims for personal injuries and loss of life are within sections 4284 and 4285 of the Revised Statutes, which require the proceeds of the offending vessel, when surrendered, to be distributed among the claimants in proportion to their respective losses, and bar the claimants of other remedy; and that the effect of those provisions is to make every admissible claim a statutory lien on the fund, and entitled to share therein pro rata, except as affected by equitable rights between the parties.

My conclusion is that any claim which the owner or the charterer, or either of them on behalf of the underwriters, may have against the Mauch Chunk, is subordinate to the claims hereinbefore allowed, and that no part of the same is payable out of the fund in court until the other claimants have been paid in full."

The commissioner's report seems to cover the ground and to render further discussion unnecessary.

All exceptions overruled and the report confirmed.