### THE STEAM DREDGE NO. 6.

#### (District Court, S. D. New York. March 2, 1915.)

1. SHIPPING ©=203—LIMITATION OF LIABILITY—CONSTITUTIONALITY OF STATUTE.

   Const. U. S. art. 3, § 2, providing that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction, authorizes Congress to vest a court of admiralty with jurisdiction of all cases of injuries by vessels or those in charge of their navigation, whether maritime or nonmaritime, and Rev. St. § 4283, amended by Act June 26, 1884, c. 121, § 18, 23 Stat. 57 (Comp. St. 1913, §§ 8021, 8028), limiting the liability of owners for losses sustained or acts committed without their privity or knowledge, although as construed by the Supreme Court it extends to nonmaritime torts, is within such authority and constitutional.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 637; Dec. Dig. ©=203.]

2. NAVIGABLE WATERS ©=19—GAS MAIN ACROSS RIVER—LAWFULNESS OF STRUCTURE—"PUBLIC PLACE."

   Under Laws N. Y. 1886, c. 248, giving the right to lay gas mains in streets, avenues, squares, and public places Harlem River is a "public place," and a gas main laid therein by authority of the city, and which does not interfere with navigation, is a lawful structure.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 59–63, 67–72; Dec. Dig. ©=19.

   For other definitions, see Words and Phrases, First and Second Series, Public Place.]

3. NAVIGABLE WATERS ©=16—NAVIGABLE PORTION OF RIVER—SILT.

   Silt and soft mud settled on the solid bottom of a river are a navigable part of the river.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 43–49, 51–53; Dec. Dig. ©=16.]

4. SHIPPING ©=81—LIABILITY OF VESSEL OWNER—INJURY TO SUBMARINE STRUCTURE BY DREDGE.

   The owner of a dredge, which, while dredging Harlem River, broke or injured a gas main laid on the bottom of the river with her spuds, *held* not liable therefor, on the ground that neither the owner nor master knew of the presence of the main, nor did they have reasonable notice to put them on inquiry.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 341, 344, 345, 347; Dec. Dig. ©=81.]

In Admiralty. Proceeding by the R. G. Packard Company, owner of Steam Dredge No. 6, for limitation of liability, wherein the Standard Gaslight Company is claimant. Petition granted.

Alexander & Ash, of New York City, for petitioner,
Shearman & Sterling, of New York City, for claimant.

HAZEL, District Judge. This is a proceeding by the R. G. Packard Company, as owner of Dredge No. 6, for limitation of liability, wherein an answer has been interposed by the Standard Gaslight Company, asserting a claim for damages to a gas main negligently caused by petitioner. Prior to the filing of the petition, an action at law had been instituted by the Standard Gaslight Company to recover damages, which

action was enjoined in this proceeding, and monition issued requiring appearance and proof of claim, as provided by admiralty rule 56 of the Supreme Court. While the dredge in question, which was 112 feet long and 36 feet 10 inches wide, was engaged in dredging material from the Harlem River at Lincoln avenue in the borough of the Bronx, near a water-front dump of the street cleaning department of the city of New York, a 20-inch gas main in the bed of the river, owned and used by claimant to supply gas to its customers, was severely crushed and broken.

Before passing to the merits on the question of negligence on the part of the petitioner, several preliminary objections to the right to limit liability will first be considered. Claimant contends that the injury was not caused, as provided by section 4283 of the Revised Statutes of the United States, amended by section 18 of the act of June 26, 1884, without the privity and knowledge of the owner, and that therefore there can be no exemption from liability; but I think this objection is not sustained by the evidence. Although Clark, the petitioner's superintendent, directed the dredge to the locality where the dredging was done, and gave notice prior thereto at the department of docks and ferries of the petitioner's intention to begin dredging, yet his entire connection with the work was prior to the actual dredging operation, which, as the evidence shows, was in the immediate charge of the master and crew. Neither Clark nor the owner was on board the dredge when the gas main was broken, and, if there was negligence in lowering the spuds of the dredge, such negligence was attributable to the master and crew, and not to the owner or superintendent. In re Rapid Transit Ferry Co. (D. C.) 124 Fed. 786.

The assumption that the negligent lowering of a spud of the dredge was not the proximate cause of the injury, and that there were prior acts of negligence by the superintendent, as, for example, the failure to notify the proper department of the intention to begin dredging, which were imputable to the petitioner, is likewise not sustained by the evidence, for the witness Trout testified that as engineer of the department of docks and ferries he had charge of all dredging operations in the municipality, and that, at Mr. Clark's request to notify representatives of submarine structures that he would begin dredging at a specified time, he notified certain companies and interests owning submarine structures at the point of dredging, but that he did not notify the claimant, as he did not know of the existence of a gas main in the bed of the river at that place. There is nothing to show that Clark knew of the gas main in question, or knew that his notice of intention to begin dredging should have been given to the department of water supply, which is claimed, under the city charter, to have direct control over gas mains in streets and public places. Clark was not chargeable with negligence for placing reliance on Trout's statement that he would notify interested parties; nor was there, in my opinion, such privity and knowledge on the part of the petitioner as to bar limitation of its liability. Richardson v. Harmon, 222 U. S. 96, 32 Sup. Ct. 27, 56 L. Ed. 110; see also The San Pedro, 223 U. S. 365, 32 Sup. Ct. 275, 56 L. Ed. 473, Ann. Cas. 1913D, 1221.

[1] It is next contended that the injury to the gas main was not due to a maritime tort, and that therefore section 4283 et seq. of the Revised Statutes do not apply, and this court is without jurisdiction. I am relieved from extensively examining into this contention by the decision of the Supreme Court in Richardson v. Harmon, supra, wherein it was held that under section 18 of the act of June 26, 1884, an addition to section 4283 of the Revised Statutes, owners of vessels may limit their liability arising from nonmaritime torts, and such proceeding by the owner is in its nature exclusive of any separate action on account of the ship. This was a radical departure from section 4283, which concededly applies only to maritime torts. Counsel urges that Congress had no power to extend the admiralty jurisdiction to nonmaritime torts, and that consideration should specially be given that point as in the Richardson Case the question of the constitutionality of section 18 was not presented; but I do not think there is any doubt of constitutional power to extend the act to nonmaritime torts. I believe that a proper construction of article 3, § 2, of the federal Constitution, which provides that judicial power shall extend to all acts of admiralty and maritime jurisdiction, includes the right of Congress to vest a court of admiralty with jurisdiction of all injuries caused, without the privity or knowledge of the owner, by the negligence of the vessel or those having charge of her navigation. Butler v. Boston & Savannah Steamship Co., 130 U. S. 527, 9 Sup. Ct. 612, 32 L. Ed. 1017.

Counsel also says that, under the interstate commerce clause, section 18 of the act of June 26, 1884, cannot be sustained, as it would seem to apply equally to interstate and intrastate commerce, and asserts that the dredge in question was not engaged in interstate commerce. This contention however is unpersuasive, for though the dredge had no motive power, and was not engaged in the transportation of property from one state into another, she nevertheless was used at the time of the mishap in deepening the waterway for vessels engaged in interstate commerce and was carrying her machinery from place to place, and was therefore subject to maritime liens and risks. North American Dredging Co. v. Pacific Mail S. S. Co., 185 Fed. 698, 107 C. C. A. 620.

[2] The next question is whether the gas main was a lawful structure. It is unnecessary to examine the many authorities cited on both sides of this proposition. I do not doubt that the Standard Gaslight Company had a right to lay its mains through streets and public places for the purpose of conducting gas from one point to another in the city of New York. By chapter 248 of the Laws of 1886 is conveyed the right to lay mains in streets, avenues, squares, and public places; and a reasonable interpretation of the words "and public places" includes the Harlem River, which, under the doctrine announced by the Court of Appeals of this state, in the Matter of The City of New York, 168 N. Y. 134, 61 N. E. 158, 56 L. R. A. 500, was no less a highway than any of the public streets of the city. The record discloses that the claimant had permission from the proper authorities to lay two 10-inch pipes, from the bulkhead at Second avenue across the Harlem River, and thence through the bulkhead at Lincoln avenue to the north side of the river. Instead of two mains, only one main was laid—a main

of obviously greater diameter than that specified in the license or permit; but such deviation, even though unauthorized, would not in my opinion relieve the petitioner from liability for breaking the main, if it were shown that it was broken through the negligent operation of the dredge, although such deviation is to be considered upon the question of interference with the reasonable use of the river for navigation.

[3] At the point of breakage, the gas main was laid 20 feet 8 inches below the mean level of the water, sloping down a little towards the Manhattan side of the river; but, as the dredging was to be done to a depth of 18 feet 6 inches only, I am disinclined to hold that the gas main was unlawfully maintained, or that it was an impediment to navigation. It was the duty of the claimant to lay its gas main in such a manner as to prevent its being struck by vessels navigating the river, and to give reasonable warning of its presence either by conspicuous signs or some other adequate means. The evidence shows that the main was not imbedded in the river, but was laid on the bottom at a point where dredging operations were more or less frequently required, and injury to it from dipper dredges, or the spuds of dredges, was a danger which should have been guarded against, either by notice or by imbedding it in a trench at the bottom of the river. It is true there was much silt and soft mud around on all sides of the gas main, but this was inadequate to protect it from boats or dredges using the alveus of the river, as it is called in Fergusson v. Union S. S. Co., Victorian Law Reports, 279. It has often been decided that silt and mud are a navigable part of a river, and on this point it will suffice to quote from the opinion of Judge Addison Brown in The City of Richmond (D. C.) 43 Fed. 85. He said:

"The use by steamers in this harbor of the undefined margin of silt between the solid ground and clear water is necessary. Every inch that can be utilized is needed, and should be scrupulously preserved for the uses of navigation, as against all unnecessary interference. Any unnecessary interference with the free movements of vessels is, in my judgment, an 'obstruction to navigation,' within the meaning and intent of the act of Congress."

See, also, Omslaer v. Philadelphia Co. (D. C.) 31 Fed. 354, and Blanchard v. Western Union Tel. Co., 60 N. Y. 510.

[4] There is much dispute over the questions of whether the break in the gas main was due to the careless manipulation of the spuds of the dredge by the crew, and whether the petitioner had knowledge of the precise location of the gas main; but it will not be useful to attempt to harmonize the contradictory testimony on these points. The evidence bearing thereon, when considered in connection with the surrounding circumstances, indicates a strong probability that the gas main was crushed or broken by contact with one of the spuds of the dredge. It is not shown that the appliances for releasing the spuds were defective, or that there was failure to exercise ordinary care in lowering them, or that the petitioner had knowledge or notice of the proximity of the gas main.

Testimony was introduced to show that upon the bulkhead on the Bronx side of the river, where the main was broken, there was a large sign about 7 feet high and 4 feet 6 inches wide, which had painted upon it in conspicuous black lettering the words, "Warning. Cables

Crossing. Do not Anchor;" and another sign which had painted upon it the words, "Water Main Crossing. Don't Anchor;" while on the Manhattan side of the river, about 547 feet from where the dredging occurred, there was a sign 5 feet 10 inches high by 2 feet 10 inches wide, placed on the elevated railway structure, bearing the words, "Pipe Crossing. Don't Anchor." The witnesses Wang and Driscoll, pilots of boats navigating the Harlem River and thoroughly familiar with the locality in question, testified that the last-mentioned sign could be observed for only a short distance going down the river, and could not be seen at all from the Bronx side, because of obstructions on the opposite bank, and that it was weather-beaten, and the lettering not clearly legible. Such signs did not, in my opinion, sufficiently apprise the master of the dredge of the presence or precise locality of the gas main in question, and were principally to prevent anchoring in their vicinity.

The presence of representatives of several concerns maintaining submarine structures at this point in the river, whose duty it was to warn the dredge whenever she came near such structures, while perhaps not relieving the master of the dredge from taking notice of the signs, nevertheless tended, I think, to create a presumption that the owners of all submarine structures were represented, and would admonish him of danger to their property. Indeed, the master of the dredge testified that it was customary for the said representatives, and one Spooner, an official from the department of docks and ferries, to prompt him to cease operations whenever the dredge came too close to such submarine structures, and to renew them when the water pipes or cables were cleared.

It is next contended that in breaking the main the master committed a trespass, and is liable, even though negligence is not proven, and many cases are cited in support of this view; but these adjudications, assuming the question open for consideration by this court, for no claim of trespass has hitherto been made herein, do not, I think, apply to the facts under consideration.

Other propositions are put forth, namely, that there can be no right to limit liability where there is but a single claim filed against the vessel, that the dredge was not a vessel, and that the tug which towed the dredge to the place of dredging should also have been surrendered by the petitioner; but the contentions made in support thereof are unsound, and do not require special attention.

My conclusion is that the petitioner was without fault; that neither the petitioner nor the master of the dredge knew of the presence of the gas main, or had reasonable notice to put them on inquiry as to its presence in the river; and accordingly a proper decree relieving the petitioner from liability for the injury to the main may be entered, with costs.