## UNITED STATES v. HENRY STEERS, Inc.

District Court, S. D. New York.
June 20, 1934.

Martin Conboy, U. S. Atty., of New York City (Thomas McCall, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Purdy & Purdy, of New York City (John E. Purdy, of New York City, of counsel), for defendant.

GODDARD, District Judge.

This action is brought by the government to recover the sum of $1,040.01 for damages to a submarine cable conveying electric current from Brooklyn across Buttermilk Channel to Governors Island. It was brought on the common-law side of the court, and, under stipulation of counsel, the testimony has been presented to a jury of one, and under a further provision of the stipulation each side has now moved for a direction of a verdict.

The cable, which was 3½ inches in diameter, was not intrenched, but was laid upon the surface of the bottom. Upon the shore of Governors Island where the cable entered the water was a large sign reading: "Do not anchor under penalty of law. Water pipe and cable crossing."

The depth of the water varies as the distance from the sea wall on Governors Island increases until it reaches the deep channel. In the first 50 feet from the sea wall the depth is 6 feet or less; from 50 to 100 feet, 6 to 9 feet deep, and gradually increases so that at 150 feet distant from the wall it is 18 feet. These soundings are at low water.

The event which is the subject-matter of this action occurred at 8:30 p. m., standard time, and low water on that date was at 8:27 p. m., standard time, so that it was practically low water. On July 22, 1931, the tug, J. Rich Steers, with two scows, the No. 64 loaded with crushed stone on her port side, and the No. 27 loaded with gravel on her starboard side, left Port Morris, 140th street and the East River, bound for Governors Island. The dock on Governors Island, where the scows were to be landed, is located some 300 feet north of the point where the cable crosses over from Brooklyn. As appears from the testimony of witnesses standing on the shore at the time that, as the Steers and her tow rounded to and approached the dock from the south and was passing over the cable less than 50 yards from the shore, there was a sudden flash from the water over the cable and upon going

to the nearby power house they found that the power was off, and subsequently the cable was examined and found to have been parted at a point about 150 feet from the shore. Although the captain of the tug, her engineer, and the captain of one of the scows, who were called as witnesses, testified that they saw no flash and felt no jolt and had no knowledge of the tug or tow coming in contact with the cable, the circumstances permit of no other reasonable conclusion but that the tug or one of the scows did come in contact with the cable and caused it to part at the weak point in it which is about 150 feet from the shore. All witnesses, however, including those on shore, say that the tug did not stop nor show any indication of being aground, but continued on up to the dock where her tows were made fast.

The Steers was about 112 feet long with 11½ feet draft; the scows were about the same length—the No. 64 having a draft of about 7½ feet, and the No. 27 about 6½ feet draft.

Title 47, § 1, USCA (R. S. § 5263), provides: "*Use of Public Domain.* Any telegraph company organized, under the laws of any State, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States over and along any of the military or post roads of the United States which have been or may hereafter be declared such by law, and over, under, or across the navigable streams or waters of the United States; but such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads."

There is no proof of any special authority for laying the cable.

■■ Decisions involving damage to cables and pipe lines make a distinction between those imbedded in a trench in the bottom or located so as to be clear of ordinary navigation and are dug up by an anchor which had been dropped in their vicinity in spite of notice of the danger to a buried cable or pipe line, and those laid on the bottom and which may be an obstruction to navigation. In the present instance the cable was not imbedded in a trench, but merely laid on the bottom. Vessels were warned against anchoring but not against navigating through the water in that vicinity. Moreover, it was navigable water, and vessels had the paramount right to use it free from obstructions. People v. Van-

derbilt, 38 Barb. (N. Y.) 282, affirmed 26 N. Y. 287.

There was nothing to put the master of the Steers on notice that the cable was not intrenched below the surface of the bottom. A qualified witness testified that it was usual and customary in laying cables to put them in a trench below the bottom where there was no possibility of vessels coming in contact with them.

No negligence is shown on the part of the master of the Steers, for he had the right to assume that there was no obstruction which would interfere with her navigation. If the cable was laid and maintained in such a manner as to be liable to damage by vessels passing over it, certainly, at least in the absence of a clear warning to that effect, the cable owner and not the vessel assumed the risk of the cable being damaged. Here there was no warning except against anchoring, which was not disobeyed.

In Western Union, etc., Co. v. Inman, etc., Co. (D. C.) 43 F. 85, 89, affirmed (C. C. A.) 59 F. 365, a telegraph company, whose submarine cables were laid in the soft mud or silt at the bottom of a navigable river in such a manner as to interfere with vessels which are accustomed to plow through the mud in their movements, was held to have obstructed navigation contrary to the provisions of R. S. § 5263 (USCA title 47, § 1), and Judge Addison Brown said: "That act permits the cables to go 'under water,' but 'not so as to obstruct navigation.' Nothing in the act gives any absolute right to lay cables in all cases on the very top of even a solid bottom. A cable so laid would not perfectly meet even the language of the statute, for it would still be in the water, and not, as the statute says, 'under the waters.' * * * The use by steamers in this harbor of the undefined margin of silt between the solid ground and clear water is necessary. Every inch that can be utilized is needed, and should be scrupulously preserved for the uses of navigation, as against all unnecessary interference. Any unnecessary interference with the free movements of vessels is, in my judgment, an 'obstruction to navigation,' within the meaning and intent of the act of congress."

In the case of John L. Blanchard et al. v. Western Union Telegraph Co., 60 N. Y. 510, an action was brought to recover· damages sustained by a tug whose keel had run afoul of a cable. Judge Allen said at page 515 of 60 N. Y.: "Telegraph cables so laid or suspended in the water as to catch upon the keels, or come in contact with vessels navigating the

stream, with such draught as the depth of water will permit, and which, but for such cables, would pass without difficulty or interruption, are improperly placed, and do injuriously interrupt navigation." See, also, The Steam Dredge No. 6 (D. C.) 222 F. 576, affirmed (C. C. A.) 241 F. 69; Omslaer et al. v. Philadelphia Co. (D. C.) 31 F. 354; Thom v. City of South Amboy, N. J. (D. C.) 236 F. 289.

In the case of United States v. North German Lloyd (D. C.) 239 F. 587, cited by plaintiff's counsel, the vessel was held liable for negligently grounding and allowing her anchor and chain to come in contact with a cable against which she had been warned. In The Elsie (D. C.) 288 F. 575, also cited by plaintiff's counsel, defendant was held liable for negligently towing a long heavy chain with a weight on the end of it in such a manner as to come in contact and break a cable of which it had notice. In Postal Telegraph Cable Co. v. P. Sanford Ross, Inc. (D. C.) 221 F. 105, and Paducah Sand & Gravel Co. v. Central Home Telephone & Telegraph Co., 209 Ky. 756, 273 S. W. 481, vessels were held liable where cables or pipe lines were damaged as a result of anchoring in their vicinity, notwithstanding signs warned vessels not to do so.

Accordingly, the jury is directed to find a verdict in favor of the defendant.